STATE ex rel. James MATHEWSON,
et al., Appellants,

v.

The BOARD OF ELECTION COMMIS-
SIONERS OF ST. LOUIS COUNTY,
et al., Respondents.

No. 75083.

Supreme Court of Missouri,
En Banc.

Sept. 2, 1992.

Opinion Concurring in Result
Modified Oct. 27, 1992.

Rehearing Denied Oct. 27, 1992.

John E. Bardgett, Charles S. Kramer, St. Louis, for appellants.

Steven W. Garrett, Carl Lumley, St. Louis, for respondents.

ROBERTSON, Chief Justice.

This case raises an issue of first impression: Whether Article III, Section 7 of the Missouri Constitution addresses special elections to fill vacancies that occur after an apportionment plan is filed but prior to the first general election in a specific district. The circuit court ruled that Article III, Section 7 controlled such special elections. We reverse and, entering the order the circuit court should have entered, direct that a writ of prohibition issue. Rule 84.-14.

### I.

On November 6, 1990, voters of the 24th senatorial district reelected Edwin Dirck to serve as their Senator for a four-year term expiring January 4, 1995. On May 15, 1992, Senator Dirck resigned. On July 13, 1992, the Governor issued a writ of election to the Board of Election Commissioners of St. Louis County (the "Board") ordering a special election to be held on September 8, 1992, to fill the remainder of Senator Dirck's term. The Governor's writ ordered the election be held in the "new" 24th Senatorial District as defined in the Missouri Senate Apportionment Plan filed with the Secretary of State on December 20, 1991. That writ also ordered the Board to follow the dictates of Section 21.130, RSMo 1986, which explicitly requires the Board to hold the special election in the "old" district, or more precisely, "within the limits composing the county or district at the time of *the next preceding general election,*" (emphasis added).

Noting the conflict between the express terms of the Governor's writ and the express directive of Section 21.130, which the Governor had also ordered be followed, relators initiated this action for prohibition or, in the alternative, mandamus. They seek an order requiring the Board to hold the special election in the "old" district. To avoid the plain mandate of the statute in this case, the Board challenges the constitutionality of Section 21.130, citing an irreconcilable conflict between that statute and Article III, Section 7 of the Missouri Constitution. The Circuit Court of St. Louis County denied the relators' writ, found Section 21.130 unconstitutional, and ordered the election to proceed in the "new" district.

### II.

Before we proceed to the merits of this case, we are compelled to address the standing of the relators. Standing is akin to jurisdiction over the subject matter, in limine. *State ex rel. Schneider v. Stewart,* 575 S.W.2d 904, 909 (Mo.App.1978). As such, the question of a party's standing can be raised at any time, even *sua sponte* by this Court.

Relators in this case do not all present a common interest. Quite properly their petition classifies their interests into two groups: the "Elector Relators" whose claim is founded on their status as residents of the "old" senatorial district but not the "new," and Senator James Mathewson in his official capacity as President Pro Tempore of the Missouri Senate, who claims to represent "the special interest" of the Missouri Senate. The relators' petition describes this "special interest" as the duty of the Senate to exercise its authority as "the sole judge of the qualifications, election and returns of its own members." Mo. Const. Art. III, § 18, *but see, State ex rel. Carrington v. Human,* 544 S.W.2d 538, 539–40 (Mo. banc 1976) (Art. III, § 18 does not preclude judicial resolution of issues arising prior to the general election).

The first group, the "Elector Relators", clearly have standing to challenge the Board's actions. If the election is held in the "new" district, they will be denied the opportunity to participate in choosing an interim replacement for the senator they

elected less than two years ago. This is the type of direct, personal stake in the outcome of the action that confers standing. *State ex rel. Williams v. Mauer*, 722 S.W.2d 296, 298 (Mo. banc 1986).

■ The standing of Senator Mathewson, however, is another matter. This Court has steadfastly refused to expand its jurisdiction to include the issuance of advisory opinions. *State ex rel. Williams v. Marsh*, 626 S.W.2d 223, 227 (Mo. banc 1982). In large part, this refusal to tread outside real controversies is a recognition that persons who do not pose present, real, live, and personal (as opposed to official) claims of right under the law do not give the Court the honed development of facts and legal argument that are the hallmark of real controversies.

Senator Mathewson, speaking only in his official capacity, presents no personal stake in the outcome of this case. At best, he can argue that the Senate *may* be required to exercise its authority under the constitution to judge the "qualifications, election and returns" of an election yet to take place. This is not the present, real, live, and personal stake in the outcome of the litigation that grants him the standing necessary to become a party in this case. *Marsh*, 626 S.W.2d at 227 ("If a party's interests are unaffected by resolution of an issue he has no standing to raise it."). Because neither Senator Mathewson (nor the Senate) has standing in this case, he is dismissed as a party to this action.

### III.

■ The burden of persuasion on the issue of a statute's validity falls squarely on the party challenging that statute. *Blaske v. Smith & Entzeroth, Inc.*, 821 S.W.2d 822, 828–29 (Mo. banc 1991). Thus, it is the Board who must overcome the presumption of validity by showing Section 21.130 "clearly and undoubtedly contravenes the constitution." *Id.* at 828. Unless such a conflict can be shown, the judgment of the legislature must stand.

The Board's challenge to Section 21.130 rests on Article III, Section 7, of the Missouri Constitution. Section 7 provides that once a plan of reapportionment has been properly filed, "[t]hereafter senators shall be elected according to such districts until a reapportionment is made as herein provided." The Board reads this section to say that reapportioned ("new") districts must be used in *every* election following the adoption of the reapportionment plan. They argue that this is the clear and unambiguous meaning of Section 7. Because Section 21.130 requires a different result, the Board concludes, there is an irreconcilable conflict between the constitution and the statute.

Contrary to the Board's contentions, we believe Article III, Section 7 is ambiguous on this issue. The question of ambiguity cannot be viewed in the abstract. A particular word or phrase in any writing is ambiguous only with reference to some specific issue. The specific issue in this case is whether the language of Article III, Section 7 addresses special elections to fill vacancies that occur after an apportionment plan is filed but prior to the next general election in a specific district. On this issue Section 7 is ambiguous.

■ In construing individual sections, the constitution must be read as a whole, considering other sections that may shed light on the provision in question. *State v. Toberman*, 363 Mo. 245, 250 S.W.2d 701, 705 (1952). As companion references in the constitution make clear, the term "shall be elected," as used in Section 7, refers only to general elections. Sections 7, 9 and 10 of Article III deal with the issue of decennial reapportionments. Section 7 twice employs the phrase "senators shall be elected" in stating when reapportionment first goes into effect. The very next time the phrase "shall be elected" occurs in the Constitution is in Article III, Section 11. That section requires that senators "shall be elected" in two classes at alternating general elections. Obviously, Section 11 does not preclude filling of vacancies in the interim. Rather, the use of the phrase "shall be elected" in Section 11 is intended to refer only to general elections, and not to special elections.

Similarly, in Section 5, of Article III, the next preceding use of the word "elected," the constitution states that members of the

senate shall be elected for terms of four years. Special elections to fill vacancies, by their nature, elect senators to shorter terms. Thus, the use of the word "elected" in Section 5 is intended to refer only to general elections, and not to special elections.

In *Rathjen v. Reorganized School District R–II*, 365 Mo. 518, 284 S.W.2d 516, 525 (1955), this Court said "[i]n the absence of a contrary intention the same meaning attaches, or is presumed to attach, to a given word or phrase repeated in a constitution, wherever it occurs therein." We believe, therefore, that when Section 7 of Article III states that senators "shall be elected," that section, as well, refers only to general elections, and not to special elections.

Where the Constitution intends to encompass special elections, it addresses the issue of vacancy or vacancies specifically. *See* Article III, Section 14 (governor shall issue writs of election to fill vacancies in either house) and Article III, Section 46(a) (legislature has extraordinary powers to assume by legislation the office of anyone incapacitated by an enemy attack on the United States provided that special elections are held as soon as possible to fill such vacancy).

Accordingly, we find that Article III, Section 7, cannot fairly be read to extend to the situation of special elections to fill vacancies that occur after an apportionment plan is filed but prior to the first general election in a specific district. The constitution is, therefore, silent on the issue of which districts to use in such elections and, where the constitution is silent, the legislature may properly address the issue. *State ex inf. Danforth v. Merrell*, 530 S.W.2d 209, 213 (Mo. banc 1975).

We hold that Article III, Section 7 of the Missouri Constitution does not govern special elections to fill vacancies that occur after an apportionment plan is filed but prior to the first general election in a specific district. Because the Board has failed to carry its burden to establish a "clear and undoubted" conflict between Section 21.130 and the constitution, and because constitutional silence provides no basis to refuse to

give effect to the statutory procedure governing special elections, the judgment of the circuit court is reversed.

## IV.

A writ of prohibition, which is hereby made absolute, is issued. Respondents are prohibited from conducting a special election to fill the vacancy using the "new" 24th senatorial district.

COVINGTON and BENTON, JJ., concur.

PRICE J., concurs in result in separate opinion filed.

GAERTNER, Special Justice, concurs in opinion of PRICE, J.

HOLSTEIN, J., dissents in separate opinion filed.

THOMAS, J., concurs in Part II of opinion of ROBERTSON, C.J., and concurs in dissenting opinion of HOLSTEIN, J.

PRICE, Judge, concurring in result.

I concur with the result reached in the opinion written by Chief Justice Robertson. I do not, however, agree that such a result can be reached solely from the contextual argument stated. As Judge Holstein shows in his dissent, the bare words of Article III, Section 7 can persuasively be argued to be "plain, clear and unambiguous." Rather, I believe this case turns on Missouri's historical practice in filling senate vacancies since the 1945 Constitution was adopted.

Article III, Section 7 never has been applied to preclude Section 21.130 from controlling in-term vacancy elections after redistricting. At least five times since 1945, in-term elections have been held to fill senatorial vacancies that arose subsequent to a reapportionment. On March 23, 1946, Governor Phil M. Donnelly issued a writ of election for the vacant 29th Senate District; the election was held on April 23, 1946. On January 18, 1954, Governor Donnelly issued another writ to fill an in-term vacancy in the 4th District; that election was held on February 9, 1954. Governor Warren E. Hearnes issued a writ of election on June 24, 1966, to fill the seat left vacant by

Senator Paul M. Berra in the 3rd District; that election was held on November 8, 1966. Governor Christopher S. Bond issued a writ of election to fill an in-term vacancy in the 26th Senate District on April 20, 1982, and a second writ to fill a vacancy in the 9th District on October 25, 1983. Those elections were held on June 8, 1982, and on December 20, 1983, respectively. In each instance, the in-term election was held within the limits of the old senatorial district even though an intervening reapportionment had created a new district.[1]

Three Missouri Attorneys General have also adopted this position, issuing opinions finding that in-term vacancies must be filled in accordance with the old districts. The first such opinion was issued on August 21, 1952, by Attorney General J.E. Taylor advising Governor Forrest Smith that only counties comprising the old senate district are entitled to vote in a special election to fill a vacancy for the remainder of the term. Two subsequent opinions also adopted this position. Opinion No. 80–82, July 30, 1982, and Opinion No. 89–92, January 24, 1992. Attorney General Opinion No. 89–92, by the present Attorney General, William Webster, concluded specifically:

> It is the opinion of this office that if an incumbent state senator vacates office after the filing of the apportionment plan and map but before the end of his term, the election to fill the vacancy is held within the boundaries composing the senatorial district at the time of the next preceding election [the old district].

Although not necessarily controlling, I cannot ignore the fact that prior to the present controversy Section 21.130 has been accepted by our elected officials without question and its provisions have been followed in every in-term senatorial election after a redistricting since the adoption of the 1945 Constitution. While it is the

role of this Court, and not Governors or Attorneys General, to finally resolve constitutional questions, I do not believe we can or should read the Constitution without reference to the world around us or our past practices.[2] "The fact that [a particular statute] has been accepted without question for more than fifty years by the executive and legislative branches of our government is persuasive of its constitutionality." *State v. Hunt,* 247 S.W.2d 969, 972 (Mo.1952), *citing State v. McGee,* 234 S.W.2d 587 (Mo.1950).

Respondents point out two additional in-term elections where the votes appear to have been reported from the new, not the old, districts. Even assuming this is so, however, these elections were held under writs that contain language directing that they be held in the old districts. The writ issued on December 28, 1962, by Governor John M. Dalton, directed that the election be held "within the limits composing the seventh senatorial district of the State of Missouri, at the time of the general election next preceding the last above-mentioned date."[3] The writ issued on October 25, 1983, by Governor Christopher S. Bond, directed that the election be held "in accordance with the provisions of Section 21.130, RSMo 1978."

Further details regarding these elections have not been presented to the Court. The argument that these elections may not have been held in accordance with the writs presents an interesting historical anomaly, but little more. We cannot speculate at this time what would have occurred had those elections been challenged. In these, as in the other writs discussed, the elected Missouri official responsible for issuing the writ did so in accordance with Section 21.-130, without challenge to its constitutionality.

---

1. The historical practice in Missouri clearly distinguishes this case from *Marston v. Kline,* 8 Pa.Cmwlth. 143, 301 A.2d 393 (1973). In *Marston,* there was no evidence of a uniform interpretation of the Constitution by three different governors allowing in-term elections immediately subsequent to redistricting to be held in the old district.

2. Missouri's historical practice establishes both the ambiguity and correct interpretation of Article III, Section 7.

3. Respondents also point out that this writ is directed to the sheriff of St. Louis County. They assert this is also inconsistent with the body of the writ specifying that election to be held within the limits of the old seventh senatorial district.

HOLSTEIN, Judge, dissenting.

I respectfully dissent.

The majority finds ambiguity in that portion of Mo. Const. art. III, § 7, which provides that after the filing of the reapportionment map and plan, "senators shall be elected according to such districts until a reapportionment is made as herein provided." I find those words to be plain, clear, and unambiguous, requiring no interpretation or construction.

The majority perceives the Constitution to be ambiguous as to whether art. III, § 7, applies to all senators elected after the filing of the plan, or just some senators after the filing of a reapportionment plan. I believe the key to understanding the quoted portions of art. III, § 7, is that it establishes the effective date for implementing the reapportionment plan for the state senate. From a reading of the entire Constitution, only art. III, § 7, dictates the time after which senators are to be elected from newly reapportioned districts. The provision in redundant fashion demands that from the filing of the reapportionment map and plan, and until the adoption of a subsequent reapportionment plan, senators are to be elected from the district described in the map and the plan. The language is unequivocal and free of proviso or exception.

Persuasive in reaching this conclusion is a remarkably similar case from Pennsylvania involving almost the same constitutional provision present here. Pennsylvania's Constitution provided that after the time for appealing a reapportionment plan had passed, "the reapportionment plan shall have the force of law, and the districts therein provided shall be used thereafter in elections to the General Assembly until the next reapportionment as required ..." *Penn. Const. of 1968 art. II, § 17(e).* Pennsylvania had staggered senatorial elections, like Missouri. State Senator Donolow died in November of 1972. His term was not to expire until 1974. A special election was called. The election was to be held after the 1970 reapportionment plan had become final. Persons excluded from voting in the "old" senatorial district brought suit to challenge the election in the newly reapportioned district. There the court stated:

> Our reading of this section of the Pennsylvania Constitution makes it *crystal clear* to us, and we therefore conclude, that its strict interpretation is, under the facts of this case, that a special election to fill the vacancy brought about by the death of Senator Donolow must be held in the new [district], as set forth in the Final Plan of the Pennsylvania Legislative Reapportionment Commission which became law June 5, 1972.

*Marston v. Kline,* 8 Pa.Cmwlth. 143, 301 A.2d 393, 396 (1973) (emphasis added).

The majority relies on the rules of constitutional construction to demonstrate that art. III, § 7, is ambiguous. The primary rule of construction relied on by Chief Justice Robertson is that of contextual construction. All rules of constitutional construction, including the rule of contextual construction, are resorted to for the purpose of making ambiguous provisions clear, not to make clear provisions ambiguous. The most fundamental principle of constitutional interpretation is that "words are to be taken in accord with their *fair* intendment and their natural and ordinary meaning," and "[w]hen language is plain and unambiguous, no construction is required." *Concerned Parents v. Caruthersville School Dist.,* 548 S.W.2d 554, 559 (Mo. banc 1977).

Even if context is considered, there is no other provision that remotely relates to the effective date of reapportionment plans for senatorial districts. Article III, § 5, establishes the length of senators' terms but makes no mention of the time reapportionment plans take effect. Article III, § 11, establishes that half of the senators shall be elected every two years, but is silent as to the effective date of reapportionment plans. Article III, § 14, relates to filling of vacancies, but it also is silent as to the time when senatorial reapportionment plans take effect. In sum, all of these provisions are complete and unambiguous within the confines of the subject matters each covers. I find neither text nor context in any of the provisions suggesting that the effec-

tive date of reapportioned senatorial districts is delayed for those senators who are elected for less than a four-year term.

Judge Price in his concurring opinion relies on another rule of construction. That rule provides that when there is an ambiguous provision in the Constitution, attorney general opinions and official legislative acts are very persuasive in resolving the ambiguity. But, as heretofore noted, where a constitutional provision is free of ambiguity, rules of construction, including our usual deference to interpretations of the other branches of government, must give way to the plain meaning. *State ex rel. Randolph Co. v. Walden,* 206 S.W.2d 979, 984 (Mo. banc 1947).

I have no disagreement with the majority's conclusion regarding the standing of Senator Mathewson. However, I would find that the statute, § 21.130, contravenes the plain language of art. III, § 7, and is unconstitutional. I would affirm the trial court.