CONTINENTAL COAL,
INC., Appellant,

v.

MISSOURI LAND RECLAMATION COMMISSION; City of Independence; Midwest Coal Resources, Inc.; Oswego Coal Co., Inc, Respondents.

No. WD 63936.

Missouri Court of Appeals,
Western District.

Dec. 14, 2004.

---

John K. Power, Kansas City, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Amy E. Randles, Timothy P. Duggan, Jefferson City, MO, for Respondent, MO Land Reclamation Comm.

Steven E. Mauer, Kansas City, for Respondent, City of Independence.

David A. Taylor, Jefferson City, MO, for Respondent, Oswego Coal, Inc.

Brian E. McGovern, Chesterfield, MO, for Respondent, Midwest Coal Resources.

Before LISA WHITE HARDWICK, P.J., ROBERT G. ULRICH and THOMAS H. NEWTON, JJ.

THOMAS H. NEWTON, Judge.

This appeal stems from administrative proceedings involving the issuance of a permit to mine coal. Appellant Continental Coal, Inc. (CCI) contends that the director of the Missouri Land Reclamation Commission (LRC) improperly issued a permit that allows Oswego Coal Company, Inc. (Oswego) to mine certain coal reserves in Bates County known collectively as the Hume Mine. CCI contends that it holds an interest in the pertinent mining leases as a creditor of a previous leaseholder, Midwest Coal, L.L.C. (Midwest Coal). CCI contends that Midwest Coal fraudulently conveyed the leases to an affiliated company, Midwest Coal Resources (Midwest Resources), which then assigned the leases to Oswego.

After the director issued the mining permit to Oswego, CCI sought administrative review of the director's decision before the LRC. The LRC upheld the director's decision. CCI then sought judicial review of the LRC's decision in the circuit court. The circuit court "affirmed" the LRC's decision and dismissed CCI's petition for review based upon CCI's purported lack of standing. CCI appeals. We agree that CCI lacks standing and affirm the judgment of the circuit court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

CCI's claim pertains to seven leases that comprise the surface and mineral estates within an area of Bates County known as the Hume Mine. At one time, Midwest Resources held six of these leases and Midwest Coal held the seventh lease.[1] Midwest Coal and Midwest Resources are affiliated companies. Midwest Coal is a coal company started by Michael G. King and Stephen S. Stipanovich in 1997. Midwest Resources is a coal company started by King and Stipanovich in 1999. King and Stipanovich own both companies. From May 1998 until May 2002, Midwest

---

1. The seventh lease is known as the "Murray Lease." Midwest Coal evidently assigned this lease to Midwest Resources on October 11, 2000.

Coal had the right to supply coal to the city of Independence under a written contract (the coal supply contract). The city holds a perfected security interest in the Hume Mine leases.

### A. Midwest Resources' Permit Application

In 2000, Midwest Resources applied for a permit to mine coal at the Hume Mine under Missouri's Surface Coal Mining Law (SCML). *See generally* § 444.800 through § 444.970.[2] The LRC is the state agency responsible for administering the SCML. *See* § 444.800.4 (directing the LRC to "rigidly enforce this law and to adopt whatever rules and regulations necessary to accomplish [the stated statutory] purposes....."). Under the supervision of the LRC director, the Land Reclamation Program (LRP) staff implements the SCML on behalf of the LRC. One of the director's duties is to review applications for surface coal mining permits. When he has received a complete permit application and reclamation plan, the director must grant, require modification of, or deny the application for a permit. *See* § 444.835.1.

The LRP staff reviewed Midwest Resources' permit application for the Hume Mine and discovered problems that could have prevented Midwest Resources from obtaining the permit. In March 2002, Midwest Resources decided to transfer its permit application to Oswego and applied to the LRP to do so. Consistent with its decision to transfer the permit application, Midwest Resources assigned the Hume Mine leases to Oswego in May 2002. Midwest Coal also assigned the coal supply contract to Oswego. In both instances, the city consented to these transfers.

The parties previously stipulated that "[a]lmost all sections of the permit application submitted by Midwest Resources re-

mained unchanged for the permit application transfer to Oswego" except that "new pages of Section One, specifically concerning Oswego Coal were submitted for review for the permit application transfer. Section One includes information required by 10 CSR 40–6–030(3), Right of Entry and Operation Information." The parties further stipulated that Midwest Resources had included with its request for the permit application transfer written, executed assignments of the seven Hume Mine leases.

### B. Oswego's Permit Application

On June 5, 2002, the director approved Midwest Resources' request to transfer its permit application to Oswego and the LRP staff reviewed Oswego's permit application. As the review of Oswego's permit application neared completion in June 2002, the director received a letter from CCI's president, Philip E. Tearney, notifying the director that CCI had a potential property interest in the coal reserves covered by the leases and that CCI had state court litigation pending concerning this interest, a case styled *GE Capital Corporation v. Midwest Coal, LLC* (the GE Capital litigation), which was filed in St. Louis County Circuit Court on May 6, 2002.

Mr. Tearney's letter indicated that CCI was acquiring loan documents from GE Capital, that Midwest Coal was the borrower under these loan documents, that King and Stipanovich were guarantors of the loan under these documents, and that the loan documents included a security agreement covering Midwest Coal's assets. Mr. Tearney explained that Midwest Coal, as well as King and Stipanovich, had defaulted on the loan and that GE previously had filed the GE Capital Litigation for breach of promissory note and breach of personal guaranties.

**2.** Unless otherwise indicated, all statutory ref-    erences are to RSMo (2000).

Mr. Tearney informed the director that CCI intended "to continue to pursue and possibly expand the scope of the Lawsuit to encompass the [coal] Reserves" and further informed him that CCI had "been advised" that King and Stipanovich "were and are the sole owners of the entity that owned the Reserves at the time the Lawsuit was commenced," that "the Reserves may have been transferred during the pendency of the Lawsuit for an amount that was less than fair and adequate under the circumstances" and that "as a result of such transfer, the guarantors may have diminished their personal estates to the detriment of creditors generally and [CCI] specifically."

Mr. Tearney concluded by requesting that the LRP "take all steps necessary to assure that the above referenced assets are not diminished in value prior to a resolution of the foregoing process."

Counsel for the director responded to Mr. Tearney's letter by requesting copies of the loan documents listed in Mr. Tearney's letter as well as a copy of the petition in the GE Capital litigation. Counsel for the director then asked:

Is Continental Coal asserting that Midwest Coal no longer owns the coal leases it has on the Tiger Mine so it cannot transfer said leases to Oswego Coal Company? Or, is this simply a matter in which Continental Coal will need to be listed as a controller on the permit to mine coal at the Tiger Mine that is being drafted for Oswego Coal Company[?]

Meanwhile, the LRP obtained copies of the U.C.C. filings between Midwest Coal and GE, which were filed on December 31, 2001. The LRP did not find in these filings any mention of the leases that make up the Hume Mine. The LRP also obtained copies of the U.C.C. filing between Midwest Coal and the city, which was filed on August 24, 2000. This filing indicated that Midwest Coal had granted a security interest to the city in eight leases, but only one of those leases—the Murray lease—is part of the Hume Mine.

In a second letter, dated June 27, 2002, Mr. Tearney notified the director that CCI also had acquired Dean Machinery Company's rights to a contract for the sale of goods and materials to Midwest Coal, a guaranty of the account executed by King, a lawsuit filed in Jackson County Circuit Court due to the failure of Midwest Coal and King to pay the amounts owing on the account, and a partial consent judgment entered by the court in that matter against Midwest Coal on January 25, 2002, in the amount of $235,804.04 plus nine percent interest after the judgment date (the Dean Machinery litigation). Mr. Tearney then said:

Of particular interest is the fact that the purported transfer to Oswego Coal Company was made *after* the entry of the Judgment. As such, Continental, in its capacity as the holder of the Judgment, will require a showing concerning the facts and circumstances surrounding the conveyance of the Murray Lease. It is our current position that there is no evidence that the conveyance was proper.

Based on all of the foregoing, Continental intends to continue to pursue and possibly expand the scope of the Dean Lawsuit to encompass the [coal] Reserves in the same manner as set forth in our previous letter and to pursue collection efforts in connection with the Judgment. This effort will be in addition to and not in limitation of the actions discussed in our earlier letter. We believe that the Reserves are in question with respect to both positions we hold as a creditor.

Once again, it is the intention of Continental to fully investigate the forego-

ing. If the facts presented indicate it is appropriate to do so, Continental will seek to have the conveyance of all of the Reserves set aside such that Midwest Coal, LLC and any personal guarantors will have assets adequate to satisfy their obligations to Continental.

Midwest Resources decided to transfer its permit application to Oswego after entry of the consent judgment against Midwest Coal in the Dean Machinery litigation. The parties previously stipulated that a copy of the petition in the Dean Machinery litigation was not provided to the LRP before the agency issued a mining permit to Oswego but that a copy of the petition in the GE Capital litigation—albeit without any of the exhibits mentioned in the petition—was provided to the LRP before the agency issued the permit.

On July 9, 2002, the director notified Oswego by letter that he had approved its permit application for the Hume Mine. The director said that he had "determined that all necessary information has been provided in accordance with the permitting requirements in chapter 10 CSR 40–6 of the Missouri Code of State Regulations." But he also alerted Oswego about CCI's claim and said:

> As you might be aware, [CCI] recently sent two letters indicating that [CCI] might have a potential interest in the coal reserves, which are the subject of this permit. Those letters are dated June 18 and June 27, 2002. If you haven't already seen those letters, we can send you copies. The purpose of mentioning [CCI's] letters is to put you on notice that [CCI] has raised the possibility of a competing claim to the reserves, and that you may want to sort out that claim prior to mining.

On August 6, 2002, CCI filed a timely request for administrative review of the director's permitting decision under section 444.850.5. On September 12, 2002, CCI also filed an amended petition in the GE Capital litigation, alleging that Midwest Coal had fraudulently conveyed the Murray lease and licenses and permits issued by the Missouri Department of Natural Resources to Midwest Resources. CCI further alleged that Midwest Resources is the alter ego of Midwest Coal, King and Stipanovich. Although the amended petition mentioned the transfer to Oswego, it did not name Oswego as a party or allege that Oswego participated in the fraud. Furthermore, while CCI asked the court to "attach[ ] any royalties derived from mining the Murry [sic] lease or the Hume Mine" and to "attach[ ] any royalties paid from Owego to Midwest Coal, Midwest Coal Resources, Midwest Coal Mining Company, Inc., King or Stipanovich," CCI did not request that the court rule on Oswego's right to mine.

Meanwhile, the LRC allowed Midwest Resources and the City of Independence to intervene in the administrative review. Oswego, Midwest Resources, and the city all filed motions to dismiss CCI's request for administrative review. The LRC denied these motions.

On October 29, 2002, the parties filed a joint stipulation of facts and waived any right to a hearing. In one of the stipulations, CCI set forth two grounds for contesting the state's action in issuing the permit: "that (1) Oswego Coal should have disclosed the pending GE and Dean Machinery litigation and the underlying issues contained in said litigations to the [LRP] on its application as it relates to the real property to be mined even though Oswego Coal was not a party to said litigation; and (2) Director Coen should have waited to issue the permit until the pending GE and Dean Machinery litigation and the underlying issues contained in said litigations

were resolved for to do otherwise was to determine disputed property interests."

All of the parties further stipulated that "other than the matters set forth in [the preceding stipulation], the state has met all requirements necessary for meeting its burden of proof at any hearing held regarding this matter."

All of the parties subsequently briefed the issues based upon the facts submitted in their joint stipulation of facts.

On May 22, 2003, the LRC issued its findings of fact, conclusions of law, and order. The LRC adopted by reference all of the facts agreed to in the parties' joint stipulations. The LRC then summarized these facts. In its conclusions of law, the LRC disagreed with CCI that the director is required to reject or defer action on any application where property rights are disputed and said:

> When read as a whole, the statutes direct the Director and the Commission to rely upon the available information regarding owners and leaseholders of record, and any available court decrees, to determine whether these documents give the applicant indicia of a right to mine the minerals to be covered by the application.
>
> Applicants are required to submit information about pending litigation so that the Director and Commission may determine whether subsequent court decrees have declared the underlying leases or other relevant instruments invalid, or whether subsequent decrees have set aside conveyances relied upon by the applicant. The Surface Coal Mining Law's declaration that the Director and Commission lack jurisdiction to adjudicate property disputes requires the Director and the Commission to disregard pending litigation over property rights in reaching a decision whether to grant or deny a permit; to take facts alleged

in such litigation into account during the permitting process would constitute the very adjudication of property rights which the statute forbids.

Contrary to Continental Coal's assertion, the granting of a permit under the Surface Coal Mining Act does not constitute an adjudication of property rights. The permit granted to Oswego merely documents that Oswego has obtained the Director's permission to extract those permitted coal reserves which Oswego in fact has the right to mine.

The LRC further concluded that Oswego was not required to disclose the GE Capital and Dean Machinery litigation to the director and said:

> It appears to the Commission that a "property dispute" does not even exist in this case. Continental Coal asserts that Midwest [Coal] LLC fraudulently conveyed assets to Midwest Resources. Continental Coal does not assert that Midwest Resources fraudulently conveyed assets to Oswego, and Continental Coal has not sued Oswego. The allegations in Continental Coal's Lawsuits relate to Midwest [Coal] LLC's alleged attempt to prevent Continental Coal from collecting on a judgment, and therefore appear to be in the nature of a creditor/debtor collection dispute rather than a property dispute. Continental Coal does not claim that it, as Midwest [Coal] LLC's creditor, presently has any property right in the lease(s). Likewise, Continental Coal does not claim that it ever had a property right in the leases before Midwest [Coal] LLC's conveyance of the lease(s) to Midwest Resources. Continental Coal merely claims that Midwest [Coal] LLC has dissipated the assets of Midwest [Coal] LLC by fraudulently conveying one or more leases to Midwest Coal. Even if a court of law were to eventually issue a

decree determining that the conveyance was fraudulent, this would not resolve whether Oswego has the right to mine the leases under its assignment from Midwest Resources, and would not vest title in Continental Coal. Presumably, in order to wrest title from Oswego, Continental Coal would have to sue Oswego. For these reasons, Oswego was not required to disclose the Lawsuits to the Director.

The LRC also disagreed with CCI that issuance of a permit to Oswego would prevent CCI from protecting any contingent rights that it may have in the coal reserves that are the subject of Oswego's permit and said:

Continental Coal has not made any effort to join Oswego or obtain a temporary restraining order against Oswego in the Lawsuits to date, but issuance of the permit will not prevent Continental Coal from doing so. Following the Director's issuance of the permit on July 9, 2002, Continental Coal amended its pleadings in the Lawsuits to add new parties. This makes it clear that the permit does not have a preclusive effect on Continental Coal's civil claims. To the extent that any party to the Lawsuits attempts to argue that the Director's permitting decision collaterally estops Continental Coal from asserting a fraudulent conveyance claim, Continental Coal can rely on the language of the Surface Coal Mining Law, which clearly eliminates any jurisdiction in the Commission to adjudicate property disputes, to refute such argument.

The LRC did not decide whether CCI had standing to seek administrative review because the LRC concluded that the director had properly issued the permit to Oswego.

On June 18, 2003, CCI filed a petition for judicial review in the Cole County Circuit Court. The circuit court allowed Midwest Resources, the City of Independence, and Oswego to intervene. These parties then filed motions to dismiss CCI's petition for lack of standing. After holding a hearing on the standing question, the circuit court "affirmed" the LRC's order and dismissed CCI's petition for lack of standing.

## II. Analysis

A party cannot obtain relief from a court if that party lacks standing. *See, e.g., Querry v. State Highway & Transp. Comm'n*, 60 S.W.3d 630, 634 (Mo.App. W.D.2001). Standing is, therefore, a threshold issue. *Id.* To have standing, the party seeking relief "must have some personal interest at stake in the dispute, even if that interest is attenuated, slight or remote." *Ste. Genevieve Sch. Dist. R II v. Bd. of Aldermen*, 66 S.W.3d 6, 10 (Mo. banc 2002).

"Standing is akin to jurisdiction over the subject matter, in limine." *State ex rel. Mathewson v. Bd. of Election Comm'rs*, 841 S.W.2d 633, 634 (Mo. banc 1992). As such, it may be raised at any time and may be raised *sua sponte* by the court. *Id.*

Because CCI's standing is at issue in this case, we address that threshold issue first.

### A. Standard of Review

When a party appeals from the circuit court's judgment in an administrative law case such as this one, we ordinarily review the decision of the LRC rather than the judgment of the circuit court. *See Lincoln County Stone Co. v. Koenig*, 21 S.W.3d 142, 145 (Mo.App. E.D.2000) (court reviewed LRC's decision to grant mining permit rather than circuit court's judgment reversing the LRC's decision).

In this case, however, both appellant and respondents appear to recognize that we should review the circuit court's judgment on the issue of standing because it was the circuit court—not the LRC—that decided this threshold jurisdictional issue.[3]

In a somewhat similar case, we reviewed the circuit court's judgment in a writ review proceeding instead of the administrative agency's decision because the party appealing from the circuit court's judgment was attacking not the agency's decision but the circuit court's jurisdiction over the matter. *State ex rel. Midwest Gas User's Ass'n v. Pub. Serv. Comm'n*, 996 S.W.2d 608, 612 (Mo.App. W.D.1999). In doing so, we applied the now-familiar standard of review that governs court-tried civil cases in this state. *Id.* (citing *Murphy*, 536 S.W.2d at 32). *See also* 20A ALFRED S. NEELY, ADMINISTRATIVE PRACTICE AND PROCEDURE, § 12.43, p. 101 (2001) ("[T]he general proposition that the appellate court reviews the agency decision and not that of the lower court is grounded in the assumption that the challenge is aimed at the agency's decision. If, instead, the object of the attack is the lower court's jurisdiction, the appellate court will review the judgment of the lower court.").

Like the appellant in *Midwest*, CCI in the first instance is challenging the circuit court's ruling on a threshold jurisdictional issue. We therefore review the circuit court's ruling on the question of standing.

**B. Standing Analysis**

Three different, but related, statutes pertain to the question of standing in this case. Section 444.850.8 addresses appeals from the LRC's permitting decisions. It says:

> Any applicant or any person with an interest which is or may be adversely affected who has participated in the administrative proceedings, and who is aggrieved by the decision of the commission or if the commission fails to act within the time limits specified, shall have the right to appeal in accordance with section 444.900.

Section 444.900 in turn specifically addresses judicial review of the LRC's decisions. It says:

> All final decisions or orders of the commission shall be subject to judicial review as provided in chapter 536, RSMo. No judicial review shall be available, however, until all administrative remedies are exhausted. The availability of such review shall not be construed to limit the operation of the rights established in section 444.880 except as provided therein.

And section 536.100 generally addresses judicial review of administrative agency decisions in contested cases. It says:

> Any person who has exhausted all administrative remedies provided by law and who is aggrieved by a final decision in a contested case, whether such decision is affirmative or negative in form, shall be entitled to judicial review thereof, as provided in sections 536.100 to 536.140, unless some other provision for judicial review is provided by statute; provided, however, that nothing in this

---

3. Appellants acknowledge in their reply brief that this court "normally reviews the agency's decision, rather than that of the circuit court" but explain that the circuit court only addressed the issue of standing and granted the motion to dismiss on that basis and question whether "it is appropriate at this juncture for this Court to review the agency's decision."

Respondents argue that "[i]t was the Circuit Court, not the Commission, that found that CCI lacked standing under the appropriate judicial review statute" and invoke the general standard for reviewing court-tried cases, which was announced in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

chapter contained shall prevent any person from attacking any void order of any agency at any time or in any manner that would be proper in the absence of this section. Unreasonable delay on the part of any agency in deciding any contested case shall be grounds for an order of the court either compelling action by the agency or removing the case to the court for decision.

No Missouri case has addressed either section 444.850 or section 444.900. Likewise, no Missouri case has addressed how all three sections work together. CCI argues, however, that the Missouri Supreme Court recently addressed analogous standing provisions in *Missouri Bankers Association v. Director of the Missouri Division of Credit Unions*, 126 S.W.3d 360 (Mo. banc 2003). In that case, a bank and a banking association challenged the decision of the credit union commission to allow a credit union to expand its field of membership. *Id.* at 362. The bank and the banking association then sought judicial review in the circuit court, which dismissed their petition for lack of standing. *Id.* at 362–63.

Standing to contest the decision granting the credit union's application to expand its membership was governed by section 370.081.5, which gives " 'any person or entity claiming to be adversely affected ... the right to contest the decision by appealing the decision to the credit union commission' " and which gives " '[a]ny party who is aggrieved by a final decision of the commission' " the right to appeal that decision to the Cole County Circuit Court. *Id.* at 363 (quoting section 370.081.5).

The Missouri Supreme Court held that this provision gave the bank and the banking association standing to contest the decision granting the credit union's application and said:

Under the plain meaning of this section, the right to appeal a decision of the Director is afforded to a uniquely broad class of affected parties, that is, to: "any person or entity claiming to be adversely affected." This language is open-ended. It is not restricted to an entity that is adversely affected in an immediate and direct manner, such as a credit union whose application is denied. Therefore, it is applicable, instead, to any person or entity that is adversely affected, directly, indirectly, and to whatever extent, by the denial or even the approval of a credit union application. A person or entity so affected is entitled to become a party to an appeal to the Commission. The party is then "aggrieved by a final decision of the Commission," if the party loses the appeal and continues to be in some way adversely affected by the underlying decision of the Director. The aggrieved or losing party then has standing to appeal the Commission's decision to the circuit court.

*Id.* at 363–64.

Concluding that section 370.081.5 controlled the question of standing on this issue, the court refused to apply the case law definition of "aggrieved" as used in section 536.100, because "the restrictive case law definition for the term 'aggrieved' under section 536.100 was formulated in the absence of any clear statutory direction" while section 370.081.5 "directs that a party is 'aggrieved' by a final decision merely by being 'adversely affected' by the decision." *Id.* at 364.

And standing to contest the validity of a state regulation in the case was governed by section 536.053, which gives " '[a]ny person who is or may be aggrieved by any rule promulgated by a state agency ... standing to challenge any rule promulgated by a state agency and [to] bring such actions pursuant to the provisions of sec-

tion 536.050.'" *Id.* at 365 (quoting section 536.053).

Initially, the court observed that section 536.053 is similar to section 370.081.5 in the sense that both are "couched in broad and unrestricted terms." *Id.* Although the credit union argued that the phrase "is or may be aggrieved" should be interpreted "solely in a temporal sense to mean that a person has standing who is now aggrieved or who may be aggrieved in the future" and that this phrase should not be interpreted to confer standing "in the substantive sense to mere economic competitors," the court rejected this argument. *Id.* The court concluded that this interpretation would make section 536.053 "redundant and meaningless" in light of section 536.050, a companion provision that already confers standing upon persons who may be aggrieved in the future. *Id.* Accordingly, the court concluded that section 536.053 also confers standing upon economic competitors. *Id.*

CCI contends that the reasoning in *Missouri Bankers* applies here as well and that CCI has standing both as a creditor seeking to establish that the Hume Mine leases in fact belong to it and as an economic competitor of Oswego Coal. We disagree.

**1. CCI's status as a creditor of Midwest Coal does not give it an interest that is or may be adversely affected by the LRC's permitting process**

Like section 370.081.5, section 444.850.8 is unique and quite broad. It gives any "applicant or any person with an interest which is or may be adversely affected who has participated in the administrative proceedings, and who is aggrieved by the decision of the commission" the right to appeal the commission's decision to the circuit court. § 444.850.8. Like section 370.081.5, it seems to direct "that a party is 'aggrieved' by a final decision merely by

being 'adversely affected' by the decision." *Mo. Bankers,* 126 S.W.3d at 364.

Unlike section 370.081.5, however, section 444.850.8 does not confer standing upon anyone merely "claiming" to be adversely affected. It confers standing only upon those who have "an interest which is or may be adversely affected." In that sense it is not as "open-ended" as section 370.081.5.

The difference in language is small but significant. Under section 444.850.5, CCI cannot obtain standing merely by "claiming to be adversely affected"; CCI can only obtain standing if it has "an interest" that is or may be affected. CCI does not have such an interest here because it currently has no rights—contingent or otherwise—in the leases that are the subject of the LRC permitting process. Instead, CCI currently has pending litigation that may or may not give it an interest in those leases sometime in the future. The current leaseholder and permit holder, Oswego Coal, is not a party to that litigation. Although CCI has obtained a partial consent judgment in the Dean Machinery litigation, that judgment is directed against Midwest Coal, not Oswego. As a general rule, the party seeking relief must have a valid interest when the action commences. *See* 59 Am.Jur.2d *Parties* § 37 (2002) ("If a plaintiff at the time of commencing an action has no valid and subsisting title or right to the subject thereof, the plaintiff's subsequent acquisition, or perfection, or a right or title to the subject of the action during the pendency thereof will not remedy the defect so as to enable the plaintiff to maintain the action."). And where an injury pertains to real property, "the right of action is in the present owner alone, and not in any subsequent purchaser or successor in title." *Id.* at § 39.

Because section 444.850.5 specifically requires that the claimant have an interest, we therefore disagree with CCI that *Missouri Bankers* allows it to assert standing merely by claiming that it will be adversely affected while it attempts to establish that it has an interest in the disputed coal leases.

**2. CCI's status as an economic competitor of Oswego does not give it an interest that is or may be adversely affected**

■■■■ We also disagree with CCI that *Missouri Bankers* supports its claim to standing based solely upon its status as an economic competitor of Oswego. "Some private rights of basic dimension entitle the person affected by administrative action to judicial review without express statutory sanction." *Cmty. Care Ctrs. v. Mo. Health Facilities Review Comm.*, 735 S.W.2d 13, 16 (Mo.App. W.D.1987). The "right" to be free from competition is not one of these, however. "Generally speaking, the 'right' to be free from legitimate competition is not a right at all and is certainly not one protected by law." *St. Joseph's Hill Infirmary, Inc. v. Mandl*, 682 S.W.2d 821, 824 (Mo.App. E.D.1984). In the case of economic competitor standing, "the right exists only when the legislature has broadened the class of affected parties to include those not otherwise having a constitutionally recognized interest." *Cmty. Care Ctrs.*, 735 S.W.2d at 16.

■■■■ For example, a bank has standing as an economic competitor to challenge the grant of a facility application to a competing bank under chapter 362 because chapter 362 expressly requires the director of finance to consider the impact on other banks when evaluating such an application.

*Bank of Belton v. State Banking Bd.*, 554 S.W.2d 451, 456–57 (Mo.App.1977). In that context, the General Assembly has demonstrated "a common legislative purpose to maintain the solvency of banks by allowing competitor banks to contest bank expansion whether in the form of a new bank charter or in expansion of service by an existing bank." *Cmty. Care Ctrs.*, 735 S.W.2d at 15.

■■■■ On the other hand, a nursing home does not have standing as an economic competitor to challenge the issuance of a certificate of need to a competing nursing home because the governing statute in that case expressly limits standing to the applicant for a permit and the health systems agency within the affected area. *Cmty. Care Ctrs.*, 735 S.W.2d at 14–15.[4] In that context, "the statutory underpinning [for competitor standing] is absent." *Id.* at 16. In both contexts, however, "[t]he legislative decision is pivotal." *Id.* at 15–16.

In this case, the General Assembly has not specifically granted standing to include economic competitors nor has it specifically limited standing to the permit applicant. *Cf. Gold Cross Ambulance, Inc. v. Mo. Dep't of Health*, 866 S.W.2d 473, 475 (Mo.App. W.D.1993). It has granted standing to not just the applicant but to "any person with an interest which is or may be adversely affected who has participated in the administrative proceedings, and who is aggrieved" by the LRC's decision. § 444.850.8.

■■■■ The question, therefore, boils down to whether this language can be interpreted to encompass economic competitors. CCI contends that this language is analogous to the language at issue in

---

4. That statute has since been amended to confer standing solely upon the applicant. *See*

§ 197.335, RSMo (2000).

*Missouri Bankers* and should likewise be interpreted to afford it standing as an economic competitor here. As noted already, however, the provisions in *Missouri Bankers* are somewhat different from the provisions in this case. Section 370.081.5 is broader than section 444.850.8 because section 370.081.5 encompasses not just those who have an "interest" but those who merely claim to be adversely affected. As the Missouri Supreme Court said in *Missouri Bankers:*

> This language is open-ended. It is not restricted to an entity that is adversely affected in an immediate and direct manner, such as a credit union whose application is denied. Therefore, it is applicable, instead, to any person or entity that is adversely affected, directly, indirectly and to whatever extent, by the denial or even the approval of a credit union application. A person or entity so affected is entitled to become a party to an appeal to the Commission.

126 S.W.3d at 363–64.

Likewise, section 536.053 is broader than section 444.850.8 because it uses the term "is or may be aggrieved" not only in a temporal sense (now and in the future) but in a substantive sense (among those who "may be aggrieved" by a rule promulgated by a state agency are economic competitors) as well. *Id.* at 365. While section 444.850.8 similarly refers to an interest that "is or may be affected," we do not believe that this language compels the same interpretation here as did section 536.053 in *Missouri Bankers.* As the Missouri Supreme Court pointed out in *Missouri Bankers,* section 536.053 is accompanied by a companion provision that already confers standing upon persons who may be aggrieved in the future. *Id.* To have interpreted section 536.053 solely in a temporal sense would have made it "redundant and meaningless" in light of the companion provision, section 536.050. *Id.* Here, CCI has not directed us to—and we have not found—an analogous companion provision that would make section 444.850.8 similarly redundant and meaningless if interpreted solely in a temporal sense.

Having reviewed the legislative scheme embodied in the SCML, we also find no evidence of a legislative purpose to confer economic competitor standing here. *Cf. Legal Communications Corp. v. St. Louis County Printing & Publ'g Co.,* 24 S.W.3d 744, 747–48 (Mo.App. E.D.2000) (where statute did not expressly determine who had standing to contest administrative action, court would look to purpose of statute to determine if the alleged injury was the type of interest that the statute seeks to protect); *Cmty. Care Ctrs.,* 735 S.W.2d at 15 (characterizing banking cases as ones in which the court examined the pertinent statutory provisions and determined that they "evidence a common legislative purpose to maintain the solvency of banks by allowing competitor banks to contest bank expansion").

Broadly speaking, the overriding goal of the SCML is to ensure that the state's energy needs are met through coal mining while minimizing as far as practicable the adverse social, economic, and environmental effects of such mining. *See* § 444.800.2(1)-(5) (the General Assembly's findings and declarations on this issue). Thus, the General Assembly has announced that the purpose of the law is to:

> (1) Provide such regulation and control of surface coal mining as to minimize or prevent its injurious effects on the people and resources of the state;

> (2) Assure that the rights of surface landowners and other persons with a legal interest in the land or appurtenances thereto are fully protected from such operations;

(3) Assure that surface coal mining operations are not conducted where reclamation is not feasible;

(4) Assure that surface coal mining operations are so conducted as to protect the environment;

(5) Assure that adequate procedures are undertaken to reclaim surface areas as contemporaneously as possible with the surface coal mining operations;

(6) Assure that the coal supply essential to the state's energy requirements, and to its economic and social well-being is provided and strike a balance between protection of the environment and agricultural productivity and the need for coal as an essential source of energy;

(7) Promote the reclamation of mined areas left without adequate reclamation prior to August 3, 1977, and which continue, in their unreclaimed condition, to substantially degrade the quality of the environment, prevent or damage the beneficial use of land or water resources, or endanger the health or safety of the public;

(8) Assure that appropriate procedures are provided for the public participation in the development, revision, and enforcement of regulations, standards, reclamation plans, or programs.

§ 444.800.3

And to carry out its legislative purpose, the General Assembly has adopted an elaborate permitting system that requires applicants to ensure, among other things, that they will be good stewards of the land and that they will reclaim the land after mining it. *See generally* §§ 444.815–444.865.

Given the General Assembly's declared purpose and the accompanying permitting system, we do not believe that section 444.850.8 can be interpreted to confer standing upon CCI solely on the basis of its status as an economic competitor of a permit applicant. Unlike laws that regulate competition in the banking industry, the SCML does not regulate economic competition; it regulates and ameliorates the adverse consequences associated with mining. *Cf. Legal Communications Corp.,* 24 S.W.3d at 748 (although status as competitor was not by itself sufficient to confer standing under statute dealing with requirements for certification to print real estate foreclosure notices, competitor nonetheless had standing in light of policy considerations where statute contemplated system of competitive regulation similar to that existing in the banking industry). The "interest" that the SCML seeks to safeguard from being "adversely affected" is not the interest of economic competitors, but the interest of those affected by the adverse consequences of coal mining operations. Accordingly, we conclude that CCI lacks standing as an economic competitor to challenge the LRC's permitting decision.

The judgment of the circuit court is affirmed.

LISA WHITE HARDWICK, P.J. and ROBERT G. ULRICH, J. concur.