In the
 Missouri Court of Appeals
 Western District

 
 CHRISTOPHER MANDACINA, 
 
 Respondent, 
 v.  WD84158
 
 AMANDA POMPEY,  OPINION FILED:
 
 Appellant;  OCTOBER 12, 2021
 
 LINDA MANDACINA, 
 
 Respondent. 

 Appeal from the Circuit Court of Clay County, Missouri
 The Honorable Alisha Diane O'Hara, Judge

 Before Division One: Alok Ahuja, Presiding Judge, Lisa White Hardwick, Judge,
 Anthony Rex Gabbert, Judge

 Amanda Pompey (“Mother”) appeals the circuit court’s Judgment awarding third-party

intervenor, Linda Mandacina (“Paternal Grandmother”), sole custody of Mother’s and Christopher

Mandacina’s (“Father”) minor son, S.M., on Mother’s “Motion to Set Aside Default Judgment or

Alternatively, Motion to Modify.” Mother asserts six points on appeal. She contends that, 1) the

Judgment of Dissolution of Marriage entered December 5, 2018, is void with regard to all orders

related to custody, visitation, or support of the minor child, contending that under Missouri law the

exclusive remedy for determining such matters for a child born out-of-wedlock is through a
Petition for Declaration of Paternity, 2) the transcript of the circuit court proceeding deprives this

court of sufficient information to make appellate review possible, arguing that ninety-six times

during trial the proceedings were indiscernible to the court reporter, 3) the circuit court denied

Mother due process and thereby erred in granting Paternal Grandmother’s Motion to Intervene,

arguing that the court granted the motion before Mother was served notice and an opportunity for

a full and fair hearing, 4) the circuit court erred in granting Paternal Grandmother’s Motion to

Intervene, arguing Missouri Rule of Civil Procedure 52.04 requires either a statutory claim of

intervention by right or a permissive intervention to protect a legally cognizable interest, and

Paternal Grandmother had neither, 5) the circuit court erred in entering its Temporary Restraining

Order without notice to Mother in violation of Rule 92.02(b)(3), and 6) the circuit court erred in

entering its Preliminary Injunction, arguing Mother’s due process rights were violated when the

court entered the order without providing Mother the benefit of giving or receiving evidence,

entering the order only two days after Mother was served the pleadings, and ordering a change of

custody without a hearing of any kind. We affirm.

 Background and Procedural Information

 In the light most favorable to the Judgment,1 the record reflects that on December 5, 2018,

the circuit court entered a “Judgment of Dissolution of Marriage,” thereby dissolving the marriage

of Mother and Father which was entered into on March 19, 2016. Father appeared at the hearing;

Mother did not. The Judgment found Father to be the “natural and biological Father of the minor

child,” Mother to be the “natural and biological Mother of the minor child,” and that the child,

born November 16, 2015, was “born of the relationship of the parties.” Father and Mother

 1
 Mother does not contend that the evidence was insufficient to support the circuit court’s Judgment.

 2
separated on November 2, 2017, and the court found that, although the child had resided in the

physical custody of both Father and Mother since birth, Mother regularly denied Father access to

the child after the couple separated. Further, that it was in the child’s best interest that Father be

granted sole legal and sole physical custody of the child, with Mother granted supervised visitation,

due to Mother’s illegal drug use and criminal behavior. A Parenting Plan was detailed in the

Judgment. Mother was awarded supervised visitation every other weekend (from Thursday at 6:00

p.m. until Monday at 6:00 p.m.) as well as various holidays and vacation time. The visitation was

to be supervised by Mother’s parents.

 The circuit court further ordered that the parties were to comply with the provisions of

Section 452.377.112 regarding relocation of the principal residence of the child. Absent exigent

circumstances as determined by a court with jurisdiction, the parties were to give at least sixty

days prior notice of any proposed relocation of the principal residence of the child. The

notification was to include the intended new residence, the home telephone number of the new

residence, the date of the intended move or proposed relocation, a brief statement of the specific

reasons for the proposed relocation of the child, and a proposal for a revised schedule of custody

for visitation with the child. The Judgment provided that, failure to obey the order of the court

regarding a proposed relocation could result in further litigation to enforce the order, including

being held in contempt of court. Further, a party’s failure to notify another party of a relocation

of the child could be considered in a proceeding to modify custody or visitation with the child.

 On May 16, 2019, five months after the dissolution Judgment was entered, Mother filed a

“Motion to Set Aside Default Judgment or Alternatively, Motion to Modify.” Therein, Mother

 2
 All statutory references are to the Revised Statutes of Missouri, as updated through 2018, unless otherwise
noted.

 3
alleged in “Count I – Motion to Set Aside” that she was never properly served notice of the

dissolution petition and summons. She contended the Special Process Server filed a Return of

Service stating that he left a copy of the summons and petition at the dwelling place or usual abode

of Mother with Mother’s Mother, Laura Pompey, but Laura Pompey denied receiving anything.

Mother’s motion included an affidavit signed by Laura Pompey wherein Laura Pompey stated that,

on or about March 30, 2018, a gentleman came to her home at 809 Oakridge, Kearney, Missouri,

and inquired as to whether Mother lived at that residence. Pompey stated that she advised the

process server that Mother “was not there and that she didn’t reside there but moved back and forth

between her home and the home I occupy with my husband.” Laura Pompey further attested that,

“at that time, my daughter was moving back and forth between her home in Platte County, Missouri

and my home in Kearney, Missouri. I considered her residence to be that of her and her husband

in Platte County[.]” Laura Pompey further stated that the process server left nothing with her, and

she had received no mail at her home from the Court or any attorney concerning the matter.

 Mother’s motion also contained an affidavit signed by Mother wherein Mother claimed

that the first she learned of the divorce “was when the court mailed to me a copy of the Court’s

Judgment on or about December 5, 2018. Before that date, I had received no Notice from anyone

concerning the case being set on the court’s docket nor had I received any notice from the court

concerning the case having been set on a dismissal docket on December 14, 2018.”3 Mother

ultimately alleged that the dissolution judgment should be set aside because the court lacked the

“power to adjudicate” because the requirements for proper service had not been met.

 3
 Mother does not indicate at what address she received this mailed notice, but the 809 Oak Ridge, Kearney,
Missouri 64060 address where the process server reported leaving notice of the dissolution action appears to be the
only address for Mother on file at that time with the court. Mother used this address, 809 Oak Ridge, Kearney,
Missouri 64060, as her address in her motion to set aside/modify.

 4
 In “Count II-Motion to Modify,” Mother alleged that a substantial and continuing change

of circumstance had occurred in the circumstances of the child and/or his custodians making the

terms of the dissolution Judgment modifiable and in the child’s best interest. Among other things,

Mother alleged that Father had assaulted Mother in the child’s presence, that Father used controlled

substances while caring for the child, that Father had threatened suicide, that Father had no

permanent residence, that Father had left the child with Mother, unsupervised, in violation of the

dissolution judgment, and that Father had stated to Mother that Paternal Grandmother had been

abusive to S.M., but also executed a Power of Attorney to Paternal Grandmother which allowed

her to maintain a supervisory role in S.M.’s life. Mother further alleged that Father sought

continued custody over S.M. “so as to exercise control over [Mother].” Finally, Mother alleged

that she had “reason to believe [Father] is not the biological [father] of the minor child.” Despite

these allegations, Mother requested that the court modify the existing Judgment to grant joint legal

and joint physical custody of S.M. to Mother and Father. Although the circuit court’s dissolution

Judgment found sole legal and physical custody to Father to be in the child’s best interest due to

Mother’s drug use and criminal behavior, Mother did not allege that her own circumstances

regarding drug use and criminal behavior had changed.

 On July 5, 2019, Mother moved the court to appoint a Guardian ad Litem, alleging that

S.M. had “suffered from emotional abuse as well as physical abuse at the hands of the [Father].”

Mother moved for DNA testing on that same date, arguing that “until DNA testing is conducted, a

question will remain about the paternity issues raised in this case.” Mother also moved for

temporary custody of the child, making the same allegations regarding Father that were made in

her motion to modify.

 5
 On July 9, 2019, Father answered Mother’s motion by denying that Mother had not been

properly served in the dissolution action, denying the allegations made against him by Mother and

that any substantial and changed circumstances made the terms of the dissolution Judgment

unreasonable, and requested that the court deny Mother’s motion.

 On October 2, 2019, Mother and Father entered a “Joint Stipulation as to Temporary

Custody and Parenting Time” that was filed by Mother and accepted by the court on October 8,

2019. This custody arrangement was to be effective until the court resolved the issues then

pending. In the Stipulation, Mother and Father agreed to share joint legal and joint physical

custody of S.M. The parties agreed that all provisions set forth in the Judgment of Dissolution of

Marriage, not specifically modified therein, would remain in full force and effect.

 On December 3, 2019, the court appointed a Guardian ad Litem to represent S.M.

 Mid-February 2020, Mother left the state of Missouri without notice and took the child to

Pennsylvania. Mother then filed a “Petition for Protection from Abuse” against Father on February

25, 2020, in Lackawanna County, Pennsylvania, which granted her sole custody of S.B. 4

 On February 27, 2020, the Guardian ad Litem filed a “Motion for Physical Examination”

requesting that the court order Mother and Father to submit to urine and hair follicle drug tests due

to allegations raised regarding the child’s safety in parental care. The Guardian ad Litem alleged

that she had been able to contact and interview Father, but had been unable to contact Mother. The

 4
 The Pennsylvania court’s final order was entered May 26, 2020. Paternal Grandmother filed a “Petition for
the Sole Enforcement of Child Custody Registration Determination from Missouri” in Lackawanna County,
Pennsylvania, which was denied June 15, 2020, and the parties were “directed to petition the Missouri court regarding
custody of the minor child, S.M. (D.O.B. 11/16/15), as soon as possible.”

 6
court granted the Guardian ad Litem’s motion on March 11, 2020, and ordered Mother and Father

to submit to testing by March 12, 2020.

 On March 18, 2020, Paternal Grandmother moved to intervene in the case pursuant to

Section 452.375.5(b), Section 507.090, and Rule 52.04, alleging that she had a claim for third party

custody, filed contemporaneously, and her joinder as a party was necessary to protect her claims,

as well as ensure judicial economy by resolving her claims together with Mother’s pending motion

to modify. On March 19, 2020, the court granted Paternal Grandmother’s motion to intervene.

 On March 20, 2020, Paternal Grandmother filed her “Petition for Third Party Custody

Pursuant to Mo. Rev. Stat. § 452.375, or in the Alternative, Grandparent Visitation Pursuant to Mo.

Rev. Stat. § 452.402.” Paternal Grandmother alleged that, after Mother’s and Father’s dissolution

on December 5, 2018, S.M. resided in Paternal Grandmother’s home with Paternal Grandmother

and Father until approximately February 15, 2020, when Mother, without notice, took the child to

reside in Pennsylvania. Paternal Grandmother further alleged that both Mother and Father were

unfit, unsuitable, or unable to parent S.M., and that S.M.’s welfare required that a third party,

specifically Paternal Grandmother, be granted custody.

 Paternal Grandmother alleged that Mother had absconded with the child and was presently

residing with Mother’s own mother, who had a history of opioid addiction. Paternal Grandmother

had observed needles in Mother’s possession while exchanging the minor child. Paternal

Grandmother alleged that Mother had been reported for child abuse and/or neglect numerous

times, and failed to cooperate with the Children’s Division in receiving services. The child was

almost four years old and allegedly not potty trained and continuing to use a bottle. Paternal

Grandmother alleged that, since the dissolution, Mother repeatedly left the minor child in Paternal

Grandmother’s care “outside the parameters of a grandparent reasonably and occasionally caring

 7
for a grandchild.” Further, during previous exchanges of the child, Mother returned the child dirty,

unbathed, and with clothes that did not fit.

 Paternal Grandmother also alleged that Father had a history of drug abuse. Further, Mother

and Father had a history of removing the child from one another’s care and withholding the child

from the other for extended periods of time, which caused the child to experience emotional harm.

Paternal Grandmother alleged that S.M. “shakes often” and believed the child in need of medical

attention that he had not received in Mother’s or Father’s care. Paternal Grandmother requested

that she be granted custody of the child, with Mother and Father to receive supervised visitation

pursuant to a proposed parenting plan.

 On March 20, 2020, Paternal Grandmother also filed “Third Party Respondent’s Motion

for Preliminary Injunction.” Therein, Paternal Grandmother requested that Mother and Father be

enjoined from having unsupervised contact with the minor child for the reason that both parents

had a history of drug abuse. Further, Mother had absconded to the State of Pennsylvania with the

child and was staying with her own mother who had a history of opioid addiction. Paternal

Grandmother simultaneously filed “Third Party Respondent’s Motion for Temporary Restraining

Order” wherein she also requested that Mother and Father have no unsupervised visitation with

the minor child.

 On March 23, 2020, the court issued a “Temporary Restraining Order and Notice of

Hearing on Preliminary Injunction and Trial Setting.” The Temporary Restraining Order granted

custody of the minor child to Paternal Grandmother and enjoined Mother and Father from

exercising any unsupervised visitation, or taking the child from anywhere the child might be found,

and removing the child from the State of Missouri. Law enforcement was ordered to assist Paternal

Grandmother in preventing Mother and Father from having unsupervised visitation. The

 8
temporary order was to expire April 2, 2020. The court ordered that a telephone conference hearing

on the application for Preliminary Injunction be held March 31, 2020.5

 On March 30, 2020, Mother was personally served with the foregoing motions and orders

issued by the court.

 On March 31, 2020, the court held a hearing on Paternal Grandmother’s motions. Father,

Paternal Grandmother, and the Guardian ad Litem appeared by telephone. Mother did not appear.

The court set aside the Judgment for Temporary Custody and Parenting Time entered on October

8, 2019, and ordered the child into Paternal Grandmother’s custody. The court ordered that the

child be immediately placed with Paternal Grandmother, with law enforcement ordered to assist

Paternal Grandmother in retrieving the child and preventing Mother and Father from having

unsupervised visitation with the child. The court set forth the visitation arrangements each parent

was to have with the child. The order was entered April 1, 2020.

 On June 24, 2020, Paternal Grandmother filed a “Motion for Drug Testing of [Mother] and

suggestions in support thereof.” Paternal Grandmother alleged, among other things, that the child

had not yet been returned to Missouri by Mother, that Mother was ordered on March 11, 2020 to

submit to drug testing and had not yet done so, that Mother had exhibited signs of recent drug use,

and there were concerns regarding S.M.’s safety in Mother’s care if Mother was using drugs.

 5
 On March 30, 2020, Father answered Paternal Grandmother’s motion for preliminary injunction. He agreed
with Paternal Grandmother’s allegation that circumstances existed that presented an immediate threat to the emotional
and physical health and welfare of S.M., and that immediate and irreparable injury, loss, or damage would result in
the absence of relief, and admitted the allegations against Mother that Paternal Grandmother had made. He denied
the allegations of drug use against him, or that he was unfit, unsuitable, or unable to parent the minor child. He asked
that the court deny Paternal Grandmother’s motion. Father also answered Paternal Grandmother’s petition for third-
party custody and motion for a temporary restraining order, requesting that the court dismiss the petition and deny the
temporary restraining order.

 9
 On July 1, 2020, the court ordered Mother to immediately submit to urine and hair follicle

drug testing in Missouri, or a similar testing facility in Pennsylvania. The case was set for trial for

October 5, 2020. On September 23, 2020, the parties were notified that the hearing remained

scheduled for October 5, 2020, however due to a Supreme Court Operating Directive, the hearing

would be held via WebEx and the parties were permitted to appear remotely.

 On October 4, 2020, Mother filed an answer to Paternal Grandmother’s petition for third

party custody/grandparent visitation. Although Mother never amended her motion to set

aside/modify which requested that joint legal and joint physical custody be granted to both Mother

and Father, she filed a parenting plan recommending Mother have sole legal and sole physical

custody of the minor child, with Father to have no physical contact, no telephone contact, and no

access to the child’s school or medical records. She additionally requested that Father be ordered

to pay child support.

 Trial

 On March 13, 2020, national and state emergencies were declared following the

classification of COVID-19 as a pandemic. This prompted the governmental shut-down of many

public buildings and facilities, as well as community-wide restrictions on travel and group

gatherings in many locations throughout the world. The Missouri Supreme Court issued

operational directives to Missouri courts which discussed permitted procedures for conducting

court hearings. Under “Operating Phase One” of the Missouri Supreme Court’s directives, which

the circuit court in this case was under at the time, judges and court staff were encouraged to utilize

all available technologies – including teleconferencing and video conferencing – whenever

possible to limit in-person courtroom appearances to the extent not prohibited by constitutional or

statutory provisions. Consequently, trial was held October 5, 2020, via WebEx (a

 10
videoconferencing platform) on Mother’s motion to set aside/modify the dissolution Judgment and

Paternal Grandmother’s petition for third party custody/grandparent visitation. All parties

appeared in person and by counsel, and the Guardian ad Litem appeared on behalf of S.M.

 Mother’s evidence6 consisted solely of the testimony of her father, Daniel Pompey, who

essentially testified that he believed Mother was suitable to care for the child and that Father was

not.7 Daniel Pompey testified that Mother came to live with him and Linda Pompey8 in February

of 2020 because Father had tried to break into Mother’s home in Missouri and Mother felt in fear

of her life.9 Daniel Pompey denied knowing that Mother was coming to Pennsylvania before she

arrived, and denied helping Mother leave Missouri. He testified that he took Mother and S.M. into

his home for Mother’s safety. Daniel Pompey and Linda Pompey lived in Missouri until

approximately March 2019, when Linda Pompey inherited a home in Pennsylvania and Daniel

Pompey and Linda Pompey moved there. In August 2019, Daniel Pompey and Linda Pompey

asked Mother if she could move to Pennsylvania with S.M., but she told them that was not possible

as she did not have custody of S.M. Daniel Pompey stated that Father and Mother had discussed

moving to Pennsylvania together with S.M.

 6
 Mother did not testify. Mother’s mother, who lived at the Pennsylvania residence with Mother, S.M., and
Daniel Pompey, and who Paternal Grandmother alleged in her petition for third-party custody had a history of opioid
addiction, also did not testify.
 7
 Daniel Pompey testified on direct examination that he had been retired as an anesthesiologist/physician
since the 1990’s. On cross examination, he testified that he relinquished his license to practice medicine in 1993 after
using the drugs he had access to as an anesthesiologist on himself. He testified that he had not “used since June of
‘93” and only used those drugs for less than a month. He stated that there is a history of depression in his family and
he was very depressed at the time, but that his depression ceased in 1993.
 8
 Daniel Pompey testified that he and Linda Pompey divorced in 2000, but “reconnected shortly thereafter”
and have been living together for the past twelve years. He referenced her as his “wife” throughout his testimony.
 9
 Daniel Pompey testified that a few weeks after this alleged incident he went to the home in Missouri and
saw damage to the door. He acknowledged that police reports from Kearney, Missouri regarding the alleged incident
indicated that there was no damage to the residence to indicate any kind of illegal entry had occurred.

 11
 Daniel Pompey testified to Father having exhibited violent tendencies and destroying a car

owned by Daniel Pompey. He testified that Father would assault Mother when they got into

arguments, but would then claim that Mother had assaulted him. Daniel Pompey believed that

Mother is safer in Pennsylvania than Missouri. With regard to S.M.’s safety, Daniel Pompey

testified that on one occasion in 2017, Daniel Pompey went to Mother’s and Father’s residence

and observed them screaming and yelling at each other, with S.M. hiding in a corner “trying to

make himself disappear.” Daniel Pompey testified to another occasion where he went to pick up

S.M. so that Father could attend a job interview, and Father appeared intoxicated. Daniel Pompey

believed Father to be “very explosive” and threatening. Daniel Pompey testified that Father had

stated that his own mother, Paternal Grandmother, was a “monster” in the way that she had treated

Father, but Father never elaborated on what he meant by this. Daniel Pompey testified that he

believed S.M. was doing well in Pennsylvania. S.M. and Mother were seeing counselors at the

Friendship House, which is an organization for mothers and children that are in “domestic upset.”10

Daniel Pompey believed it to be in S.M.’s best interest to stay in Pennsylvania. Daniel Pompey

was unaware of any illegal drug use by Mother except for finding “some pot” in the house when

she was a teenager. He acknowledged that Mother had participated in a drug court “diversion

program a number of years ago.”

 Paternal Grandmother testified on her own behalf in support of her “Petition for Third Party

Custody Pursuant to Mo. Rev. Stat. § 452.375, or in the Alternative, Grandparent Visitation

 10
 The record reflects that the Lackawanna County, Pennsylvania court’s order denying Paternal
Grandmother’s “Petition for the Sole Enforcement of Child Custody Registration Determination” and directing the
parties to “petition the Missouri Court regarding custody of the minor child,” also ordered Mother to “continue
counseling with Bobbi Fratzola and abide by all recommendations,” and ordered the minor child to “undergo an
evaluation at the Friendship House[.]” Neither Bobbi Fratzola nor anyone from the Friendship House testified at the
hearing.

 12
Pursuant to Mo. Rev. Stat. § 452.402.” Paternal Grandmother testified that neither Father nor

Mother were fit, suitable, or able to be a custodian for S.M. She testified that Father was presently

agreeing with his own inability to serve as custodian for S.M., as he had a history of drug abuse

and had been in jail during the pendency of the case. As a result, Paternal Grandmother’s testimony

focused on her concerns regarding Mother.

 Paternal Grandmother testified that she had concerns that Mother used drugs because she

saw needles fall from Mother’s purse when they were exchanging the child, and observed needle

tracks on Mother’s arms as well as sores on her face. Further, when the court granted sole custody

to Father in 2018 and limited mother to supervised visitation, the court cited Mother’s drug use

and criminal behavior as reasons. Paternal Grandmother was aware that Mother had used

methamphetamine, heroin, and marijuana since S.M.’s birth. Paternal Grandmother believed that

she had observed Mother under the influence of drugs as evidenced by Mother becoming violent.

Mother had driven her truck through Father’s garage door. Paternal Grandmother observed Mother

write all over the outside of Father’s house, write on the street, and put rocks down the toilet.

Paternal Grandmother stated that Mother and Father were violent toward each other in front of

S.M. Mother threatened to go to Paternal Grandmother’s house and “kick my ass,” “destroy my

house,” and “destroy our lives.” Mother once tried to run Paternal Grandmother over in her

driveway, and Paternal Grandmother presently lived in an undisclosed location for fear of Mother

hurting her or her family. Mother had been ordered by the court to submit to drug testing, but

Mother had submitted to no testing in the state of Missouri since the case had been pending.

Although Paternal Grandmother was apprised the morning of trial that Mother submitted to some

testing in Pennsylvania, Paternal Grandmother was not satisfied with this testing as it did not

comply with the timeframes ordered by the circuit court in Missouri, did not include a hair follicle

 13
test as ordered by the court, and at least one of the urinalysis tests showed that Mother had not

been observed while providing the urine sample.

 In October of 2017, Paternal Grandmother contacted the police due to concern for S.M.

because he was at Mother’s home and “she wouldn’t open the door, and I was concerned for him

being hurt, because she was in bed and other people in bed and drugs[.]” The police report

regarding this incident showed that there was also a dispute between Mother and Father at that

time, and both had orders of protection against each other. The bottom of the police report

indicated that Mother intended to drive to Pennsylvania with S.M. and a woman she had just met

at a casino. Hence, as this report was from 2017, February of 2020 was not the first time Mother

had considered taking S.M. to Pennsylvania. A police report dated April 21, 2018, was made by

Mother’s own mother, who called the police to report Mother missing. Paternal Grandmother

testified that this was not the only time Mother left without anyone knowing where she had gone.

When Paternal Grandmother kept S.M., she never knew where Mother was and never knew when

she was going to return to get S.M.

 Paternal Grandmother testified that, prior to S.M. leaving Missouri with Mother, S.M.

would be dropped off at her house by either Father or Daniel Pompey, and would stay at her home

for over a week thereafter. Paternal Grandmother always had concerns about S.M. after he was

dropped off because he would be “jumping off the walls for a couple of days,” hard to talk to, and

upset about his mother and father. S.M.’s hygiene was “horrible” when he was dropped off, as he

was always dirty, with dirt on his face and underneath his toenails and fingernails. Paternal

Grandmother testified that she had potty trained S.M. with no assistance from Mother, but Mother

would tell S.M. that he could wear a diaper forever because he was her baby, and he would be

 14
dropped off at Paternal Grandmother’s home wearing a Pull-Up. Paternal Grandmother stated that

S.M.’s hands shake badly, but no one has ever consulted a doctor to determine why.

 Paternal Grandmother testified to a police report dated August 8, 2018, which involved

another domestic dispute between Mother and Father. Mother and Father frequently fought in

front of the child, and often kept S.M. from each other when the two had shared custody. Paternal

Grandmother recalled on numerous occasions waiting to pick S.M. up from Daniel Pompey at a

designated time, and becoming worried after a couple of hours passed and they had not shown up.

They would ultimately state that they had decided not to come, giving “different reasons all the

time.”

 Paternal Grandmother testified to additional police reports involving Mother and Father

dated November 24, 2019, December 11, 2019, and December 12, 2019. The report dated

December 12, 2019, was made by Mother who alleged S.M. had been kidnapped. Paternal

Grandmother testified that S.M. had not been kidnapped and he was in her care at the time. Father

lived with Paternal Grandmother after the dissolution action. Because Father had been granted

sole legal and sole physical custody of S.M. with supervised visitation to Mother, S.M. essentially

lived with Paternal Grandmother “all the time.”

 On February 17, 2020, the Kearney police were again called, this time by Father. It was

his parenting time and Mother refused to allow him to pick up the child. Mother apparently also

called the police on this date and alleged that a burglary was in progress at her home, but would

not open the door when police arrived. Shortly thereafter, Mother left for Pennsylvania with S.M.

She was driven there by a man whom Paternal Grandmother saw in the news as having been

arrested for possessing drugs and guns. At the time of the October 2020 trial, Paternal

Grandmother had not seen, spoken to, or had any contact with S.M. since Mother took him to

 15
Pennsylvania. Paternal Grandmother testified that Mother had one other child who was fifteen or

sixteen years old. The child was presently in the custody of Mother’s parents pursuant to a

guardianship proceeding wherein Mother was declared unfit, unwilling, and unable to parent the

child.

 Paternal Grandmother also testified to concerns regarding Mother’s parents, with whom

Mother resided at the time of trial. Paternal Grandmother was aware that Mother’s mother had

had opiate problems in the past and had been admitted to different drug facilities.

 Paternal Grandmother requested that she be granted sole legal and sole physical custody of

S.M., with supervised visitation to Mother and Father. She provided testimony related to her

ability and willingness to properly care for S.M.

 On October 12, 2020, the circuit court entered its Judgment of Modification. Therein the

court found that Mother had absconded to Pennsylvania in violation of the court’s orders and had

refused to cooperate with the court. Further, that Mother had filed litigation in the State of

Pennsylvania in order to frustrate the court’s ability to enforce its orders. Mother had also kept

the child from both Father and Paternal Grandmother in violation of the court’s orders. The court

found that both Mother and Father are unfit, unsuitable, or unable to be a custodian of S.M. Father

conceded to this finding, without objection. The court found that Mother had a long history of

drug abuse including methamphetamines and opioids, and that Mother had not provided drug

screen results in response to the court’s orders. The court found that it was in the child’s best

interest for sole legal and sole physical custody to be placed with Paternal Grandmother, with

Mother and Father to receive supervised visitation.

 This appeal follows.

 16
 Points on Appeal

 Point I – Validity of Dissolution Judgment

 In Mother’s first point on appeal, she contends that the Judgment of Dissolution of

Marriage entered on December 5, 2018, is void as to all orders regarding the custody, visitation,

or support of the minor child. Mother argues that the exclusive remedy under Missouri law for

determining custody, visitation, and support of a minor child born out of wedlock is through a

Petition for Declaration of Paternity, and the minor child, S.M., was born in 2015, but the parties

did not marry until 2016. Mother contends that the circuit court had no “subject matter

jurisdiction” over issues of custody, visitation, or support of S.M., making the court’s orders void.11

 “Whether a judgment is void for lack of subject matter jurisdiction is a question of law that

we review de novo.” Community First Bank v. Hanifin, 500 S.W.3d 881, 883 (Mo. App. 2016). A

judgment issued in excess of the trial court’s jurisdiction is void. In re Moreau, 161 S.W.3d 402,

405 (Mo. App. 2005). Subject matter jurisdiction is the “court’s authority to render a judgment in

a particular category of case.” J.C.W. ex rel. Webb v. Wyciskalla, 275 S.W.3d 249, 253 (Mo. banc

2009). “[T]he subject matter jurisdiction of Missouri’s courts is governed directly by the state’s

constitution. Article V, section 14 sets forth the subject matter jurisdiction of Missouri’s circuit

 11
 Mother raises this claim for the first time on appeal. Her motion to set aside the circuit court’s judgment
claimed only that she had not been properly served notice of the dissolution action. Mother essentially abandoned her
motion to set aside at trial by presenting no evidence regarding these allegations, and advocating only that the court
grant her modification requests. In Mother’s motion to modify, although Mother alleged that a substantial and
continuing change of circumstances had occurred making the terms of the judgment modifiable because, among other
things, she had “reason to believe Petitioner is not the biological [father] of the minor child,” she requested only
modification of the judgment regarding this claim and not that it was void or should be set aside. Despite questioning
Father’s paternity, she requested that Father be given joint legal and physical custody, and never amended her motion
to request otherwise. On the eve of trial, Mother filed a proposed parenting plan advocating that Mother be granted
sole legal and sole physical custody of S.M. and that Father be allowed no contact.

 17
courts in plenary terms, providing that ‘[t]he circuit courts shall have original jurisdiction over all

cases and matters, civil and criminal.’” Id. (Emphasis original).

 In J.C.W. ex rel. Webb v. Wyciskalla, after a lengthy discussion of “jurisdiction” as related

to Missouri circuit courts, our Missouri Supreme Court simply stated that, because the case before

it was civil, the circuit court had subject matter jurisdiction. Id. at 254 (“The present case is a civil

case. Therefore, the circuit court has subject matter jurisdiction and, thus, has the authority to hear

this dispute.”) The Court went on to state that, “[w]hen a statute speaks in jurisdictional terms or

can be read in such terms, it is proper to read it as merely setting statutory limits on remedies or

elements of claims for relief that courts may grant.” Id. at 255. Here, because the dissolution

action was civil, the circuit court had subject matter jurisdiction to hear it and the issues contained

therein, including matters of custody, visitation, and support of the minor child. Id.

 With regard to Mother’s claim that the “exclusive remedy for determining custody,

visitation and support of a minor child born out-of-wedlock is through a Petition for Declaration

of Paternity,” we note that, “Missouri recognizes the [Uniform Parentage Act] as an authoritative,

yet not exclusive, statute for proving and litigating parentage.” Truong v. Truong, 564 S.W.3d 761,

765 (Mo. App. 2018). Notably, the Uniform Parentage Act presumes a man to be the natural father

of a child under certain circumstances, including when, pursuant to Section 210.822.1(3):

 After the child’s birth, he and the child’s natural mother have married or
 attempted to marry each other by a marriage solemnized in apparent compliance
 with the law, although the marriage is or may be declared invalid, and:

 (a) He has acknowledged his paternity of the child in writing filed with the
 bureau; or

 (b) With his consent, he is named as the child’s father on the child’s birth
 certificate; or

 18
 (c) He is obligated to support the child pursuant to a written voluntary promise
 or by court order.

Additional presumptions of parentage are provided in the statute for a child born out of wedlock,

such as when an expert concludes that blood tests show the alleged father to have a 98% or higher

probability of paternity. Id. at § 210.822.1(4). Presumptions pursuant to this section may only be

rebutted by clear and convincing evidence. Id. at 210.822.2. A signed acknowledgment of

paternity form pursuant to Section 193.215 that has not been rescinded sixty days after signing is

considered a legal finding of paternity. § 210.823.1. Thereafter, such acknowledgment may only

be challenged in court on the basis of fraud, duress, or material mistake of fact, with the burden of

proof upon the challenger. Id. Notably, Section 210.823.1(2) states that, “No judicial or

administrative proceeding shall be required or permitted to ratify an unchallenged

acknowledgment of paternity.” (Emphases added).12

 Moreover, a petition for a declaration of paternity is not a required prerequisite, as Mother

claims, for establishing paternity of a child born out of wedlock. There are various ways S.M.’s

paternity could have been established prior to Father ever filing the dissolution action. Father

asserted in the dissolution action that he was S.M.’s father. Mother did not contest this claim. The

court’s December 5, 2018, Judgment found Father to be the “natural and biological Father of the

minor child.” Although Mother admits to having received notice of the dissolution Judgment

immediately after it was rendered, Mother did not appeal the Judgment and/or otherwise contest

the court’s findings with regard to paternity, custody, visitation, or support of the child. When

 12
 Pursuant to Section 193.085.7, if a child is born to unmarried parents, the name of the father and other
required information shall be entered on the certificate of birth only if an acknowledgment of paternity pursuant to
Section 193.215 is completed, or paternity is determined by a court of competent jurisdiction or by an administrative
order of the family support division. The child, S.M., shares Father’s surname which is presumably, therefore, on the
child’s birth certificate. The circumstances underlying S.M. being given Father’s surname at birth is not in the record
before us.

 19
Mother filed her “Motion to Set Aside Default Judgment or Alternatively, Motion to Modify” five

months later, paternity was not a basis for which she argued the court’s Judgment should be set

aside. Although Mother mentioned, as a basis for arguing that a change in circumstances existed

so as to justify modification of the Judgment, that she had “reason to believe Petitioner is not the

biological of the minor child,” Mother still requested that the court “modify the existing Judgment

by granting joint legal and joint physical custody” to Mother and Father.

 As stated, the Dissolution of Marriage action involving Mother, Father, and their minor

child was civil, and the circuit court had subject matter jurisdiction to adjudicate matters contained

within that action, including custody, visitation, and support of the minor child. That judgment is

now final. Because the court had subject matter jurisdiction over the dissolution action, Mother’s

contention (for the first time on appeal) that the judgment is now void because paternity was

allegedly never properly established is a collateral attack on the court’s paternity finding in that

action. “Where a judgment is attacked in other ways than by proceedings in the original action to

have it vacated or reversed or modified or by a proceeding in equity to prevent its enforcement,

the attack is a collateral attack.” M.W. v. S.W., 539 S.W.3d 910, 918 (Mo. App. 2017) (internal

quotation marks and citations omitted). A “collateral attack” is also “an attempt to impeach a

judgment in a proceeding not instituted for the express purpose of annulling the judgment.” Id. at

919. “As a general rule a judgment rendered by a court having jurisdiction of the parties and the

subject matter, unless reversed or annulled in some proper proceeding, is not open to contradiction

or impeachment in respect to its validity or binding effect in any collateral proceeding.” La Presto

v. La Presto, 285 S.W.2d 568, 570 (Mo. 1955).

 “[T]he res judicata doctrine prevents plaintiffs from relitigating issues already determined

against them in a prior action.” Snelling v. Kenny, 491 S.W.3d 606, 613 (Mo. App. 2016). “[R]es

 20
judicata applies not only to the specific issues ruled upon by the court and used to form the court’s

judgment, but also to issues that the parties could have brought in the previous litigation.” Id. “A

finding of paternity in a dissolution is res judicata on the issue of paternity in subsequent

proceedings between the former spouses.” State ex rel. Conners v. Miller, 194 S.W.3d 911, 913

(Mo. App. 2006).

 We conclude that the circuit court’s dissolution judgment is not void for lack of subject

matter jurisdiction, and that Mother’s claims with regard to paternity are collateral attacks on the

final dissolution judgment and barred by the doctrine of res judicata.

 Mother’s first point on appeal is denied.

 Point II – Transcript on Appeal

 In Mother’s second point on appeal, she contends that the Judgment of Modification must

be reversed and remanded for a new trial because the transcript of the proceeding deprives this

court of sufficient information to make appellate review possible. Mother argues that ninety-six

times during trial the proceedings were indiscernible or inaudible to the court reporter, and seventy-

one of these times were during the questioning and answers of the witnesses.

 “The record on appeal shall contain all of the record, proceedings and evidence necessary

to the determination of all questions to be presented… It is divided into two components: the

legal file and the transcript.” Rule 81.12(a). “The transcript shall contain the portions of the

proceedings and evidence not previously reduced to written form and necessary to determination

of the issues on appeal.” Rule 81.12(c)(2). “An appealing party is entitled to a full and complete

transcript for the appellate court’s review.” State v. Middleton, 995 S.W.2d 443, 466 (Mo. banc

1999). However, a record that is incomplete or inaccurate does not automatically warrant a

reversal of the matters before the court. Id. To be entitled to reversal, the appellant must show the

 21
exercise of due diligence to correct the deficiency in the record, and that the appellant was

prejudiced by the incompleteness of the record. State v. Barber, 391 S.W.3d 2, 5 (Mo. App. 2012).

 Here, we need not delve into Mother’s diligence in obtaining a complete transcript as it is

clear that Mother is not prejudiced by the alleged deficiencies. With the exception of this point on

appeal (Point II, which regards the trial transcript), Mother’s claims on appeal all involve questions

of law: 1) Point I, Mother contends the circuit court was without subject matter jurisdiction to

entertain issues regarding the child, 2) Point III, Mother contends that the grant of intervention to

Paternal Grandmother violated Mother’s due process rights, 3) Point IV, Mother contends that

Paternal Grandmother had no valid claim for intervention, 4) Point V, Mother contends that entry

of the temporary restraining order violated Missouri law, and 5) Point VI, Mother contends that

entry of the preliminary injunction violated Mother’s due process rights. As none of these claims

require review of the trial testimony, which Mother contends was inadequately captured in the

transcript, Mother cannot show that the trial transcript is necessary to resolve the issues she has

raised on appeal, or that she is prejudiced by any alleged deficiencies.13

 Mother’s second point on appeal is denied.

 Points III - Paternal Grandmother’s Intervention and Mother’s Due Process

 In Mother’s third point on appeal, she contends that the circuit court erred in granting

Paternal Grandmother’s Motion to Intervene, arguing that doing so denied Mother due process of

law because the court granted the motion before Mother was served notice. Mother contends that

 13
 We note ex gratia that, it is clear from the record that the court reporter was working under unique
circumstances in that all parties appeared remotely and were testifying via WebEx video due to the circuit court being
under “Phase One Supreme Court Operating Directive,” which was issued in response to the COVID-19 pandemic.
Even so, upon reviewing the transcript it is clear that the indiscernible or inaudible words that the court reporter was
unable to transcribe at various points throughout the proceedings would not have impacted our ability to address
questions regarding factual determinations by the court had such issues been raised.

 22
Paternal Grandmother filed her Motion to Intervene on March 18, 2020, the court granted the

motion on March 19, 2020, and Mother was not served until March 31, 2020.14

 When Mother was served Paternal Grandmother’s motion to intervene on March 30, 2020,

she was also served with Paternal Grandmother’s Petition for Third Party Custody/Grandparent

Visitation, Paternal Grandmother’s Motion for Preliminary Injunction, Paternal Grandmother’s

Motion for Temporary Restraining Order, as well as the court’s “Temporary Restraining Order and

Notice of Hearing on Preliminary Injunction and Trial Setting.” On September 24, 2020, (six

months after Mother was served notice of Paternal Grandmother’s intervention), Mother scheduled

her motion to set aside/modify for hearing on October 5, 2020.15 When Mother moved to dismiss

Paternal Grandmother’s Petition for Third Party Custody/Grandparent Visitation and filed an

Answer to that Petition on October 4, 2020, Mother never argued that Paternal Grandmother’s

ability to proceed on her Petition for Third Party Custody/Grandparent Visitation was foreclosed

because Mother had not been given an adequate opportunity to contest Paternal Grandmother’s

intervention. Mother’s primary contention was that the court had no jurisdiction to proceed

because the Lackawanna County Court of Common Pleas in Pennsylvania had issued a protective

order giving sole legal and sole physical custody to Mother. Mother ultimately proceeded to trial

on her motion to modify and Paternal Grandmother’s petition for third-party custody, never

advising or alerting the court that she believed her due process rights had been violated when

Paternal Grandmother was allowed to intervene in the action.

 14
 The record reflects that Mother was served March 30, 2020.
 15
 October 5, 2020, was the same date Paternal Grandmother had, on July 23, 2020, notified the parties that
the case would be taken up for trial.

 23
 Rule 55.27(a) states that the defense of lack personal jurisdiction to any pleading, including

a third-party claim, shall be asserted in the responsive pleading if one is required, or by motion. If

no responsive pleading is required, the adverse party may assert at the trial any defense in law or

fact to the claim for relief. Id. Rule 55.27(g)(1) states that a defense of insufficiency of process

or insufficiency of service of process is waived if not raised by motion under Rule 55.27 or

included in a responsive pleading.

 ‘[P]ersonal jurisdiction refers ... to the power of a court to require a person
 to respond to a legal proceeding that may affect the person’s rights or interests.’
 J.C.W. ex rel. Webb v. Wyciskalla, 275 S.W.3d 249, 253 (Mo. banc 2009). ‘[W]hen
 a court says that it lacks personal jurisdiction, it means simply that the constitutional
 principle of due process bars it from affecting the rights and interests of a particular
 person, whether such a ‘person’ be an individual or an entity such as a corporation.’
 Id. ‘Only by service of process authorized by statute or rule (or by appearance) can
 a court obtain jurisdiction to adjudicate the rights of a defendant.’ Worley v. Worley,
 19 S.W.3d 127, 129 (Mo. banc 2000). A defendant must raise any challenges to the
 trial court’s personal jurisdiction, the sufficiency of process, and the sufficiency of
 service of process in either a pre-answer motion or as a defense in the answer. Rule
 55.27(g)(1); Worley, 19 S.W.3d at 129. The failure to raise these issues at the first
 opportunity results in waiver of any challenges to the trial court’s personal
 jurisdiction, the sufficiency of process, and the sufficiency of service of process.
 Rule 55.27(g)(1); see also Stiens v. Stiens, 231 S.W.3d 195, 199 (Mo. App. W.D.
 2007).

Interest of A.R.B., 586 S.W.3d 846, 859 (Mo. App 2019).

 By not raising her insufficiency of notice claim at the first opportunity, Mother has waived

it.

 Mother’s third point on appeal is denied.

 Point IV – Paternal Grandmother’s Legal Right to Intervention

 In Mother’s fourth point on appeal, she contends that the circuit court erred in granting

Paternal Grandmother’s Motion to Intervene because Rule 52.04 requires either a statutory claim

of intervention by right, or a permissive intervention to protect a legally cognizable interest, and,

 24
1) Paternal Grandmother had no statutory claim of intervention by right under Section 452.375.5,

or 2) a legally cognizable interest to protect via permissive intervention because her motion to

modify did not plead the necessary elements for intervention.

 Mother acknowledges that Paternal Grandmother could have had her petition for third party

custody heard in a separate action, and contends that Paternal Grandmother was not entitled to

intervention by right pursuant to In re the Matter of: A.A.M. by next friend J.D.S. and J.D.S., 522

S.W.3d 351 (Mo. App. 2017), for this very reason. We need not address whether Paternal

Grandmother was entitled to intervention by right, as she was undoubtedly entitled to permissive

intervention.16

 With regard to Mother’s claim that Paternal Grandmother had no right to permissive

intervention, Mother contends only that Paternal Grandmother did not plead the necessary facts to

prove such intervention. We find this allegation akin to a claim that Paternal Grandmother failed

to state a claim upon which relief could be granted. Pursuant to Rule 55.27(g)(2), such claims are

 16
 Mother contends that In re the Matter of: A.A.M. by next friend J.D.S. and J.D.S., 522 S.W.3d 351 (Mo.
App. 2017), is dispositive of whether Paternal Grandmother had an Intervention of Right under Rule 52.12 because
A.A.M. held that, “to the extent the [Intervenors] could be said to have a legally protectable interest to third-party
custody or third-party visitation pursuant to Section 452.375.5, intervention was not required in the paternity action
to protect those interests because, under the current state of the law, they can file an independent action seeking the
same relief.” Id. at 358.

 The facts of A.A.M. are significantly different than those before us. They involved a father seeking a
declaration of paternity and sole legal and physical custody of a child whom he had not been named as father at the
child’s birth, but approximately a year after the child was removed from the mother’s care by the Division of Family
Services, he was named a putative father. Id. at 353-354. A maternal great-aunt and great-uncle sought to intervene
in the paternity action and sought guardianship in a separate action. Id. The maternal great-aunt and great-uncle were
denied intervention in the paternity case; however, the paternal grandmother was allowed intervention and was
ultimately awarded joint legal and joint physical custody with the father. Id. at 355. The great-aunt and great-uncle
appealed the denial of their intervention in the paternity action. Id. The question in the appellate case, viewing the
factual findings in the light most favorable to the trial court’s judgment, was whether the court erred in denying the
great-aunt and great-uncle’s motion to intervene. Aside from making the above statement regarding Section 452.375,
the court found that the proposed intervenors had not pled or proven the elements necessary to warrant intervention
by right. Id. at 358. Because the court found that the appellants had not pled or proven the elements necessary to
warrant intervention by right, we cannot say that A.A.M. stands for the broad proposition that an intervenor can never
meet the elements for intervention of right if an independent action seeking the same relief could also be filed.

 25
waived if not raised with the trial court in the manner provided for in the rule, and cannot be first

raised on appeal. Stephens Cemetery, Est. 1864, Inc. v. Tyler, 579 S.W.3d 304, 305 (Mo. App.

2019). Mother never raised with the trial court, until after judgment was entered, the claims she

now raises with regard to the court granting intervention to Paternal Grandmother. Having not

raised these claims sooner and giving the circuit court the opportunity to address them, we believe

they have been waived.17

 Nevertheless, to the extent this issue could be viewed as a question as to whether Paternal

Grandmother had standing to pursue her third-party petition for custody/visitation within the

modification action,18 we will address how Paternal Grandmother met the requisite elements for,

at the very least, permissive intervention, and thus had standing in the matter. Rule 52.12 provides:

 (a) Intervention of Right. Upon timely application anyone shall be permitted to
 intervene in an action: (1) when a statute of this state confers an unconditional
 right to intervene or (2) when the applicant claims an interest relating to the
 property or transaction that is the subject of the action and the applicant is so
 situated that the disposition of the action may as a practical matter impair or
 impede the applicant's ability to protect that interest, unless the applicant's
 interest is adequately represented by existing parties.

 (b) Permissive Intervention. Upon timely application anyone may be permitted to
 intervene in an action: (1) when a statute of this state confers a conditional right
 to intervene; or (2) when an applicant's claim or defense and the main action
 have a question of law or fact in common; or (3) when the validity of a statute,
 regulation or constitutional provision of this state, or an ordinance or regulation
 of a governmental subdivision thereof, affecting the public interest, is drawn in
 question in any action to which the state or governmental subdivision or an
 officer, agency or employee thereof is not a party, the court may in its discretion
 notify the chief legal officer of the state or governmental subdivision thereof,
 and the state or governmental subdivision may in the discretion of the court be
 permitted to intervene, upon proper application.

 17
 Mother does not contend that the factual record does not support a grant of permissive intervention to
Paternal Grandmother, only that Paternal Grandmother’s pleadings were deficient to warrant the grant.

 “[T]he question of a party’s standing can be raised at any time, even sua sponte” by the court. State ex rel.
 18

Mathewson v. Board of Election Comm’rs of St. Louis County, 841 S.W.2d 633, 634 (Mo. banc 1992).

 26
Rule 52.12(c) states that the motion for intervention “shall state the grounds therefore, and shall

be accompanied by a pleading setting forth the claim or defense for which intervention is sought.”

 Paternal Grandmother moved to intervene on March 18, 2020, alleging that she had a claim

for third party custody under Section 452.375 that would best be resolved along with Mother’s

pending modification action. Paternal Grandmother’s Petition for Third Party Custody/Visitation

alleged that Mother left the State of Missouri with the child in violation of the court’s prior order,

and for various other reasons, including the unfitness of both parents and that the child had lived

with Paternal Grandmother a significant portion of his life, it was in the child’s best interests to

place custody with Paternal Grandmother. Further, that in lieu of custody, Paternal Grandmother

be granted visitation rights. Paternal Grandmother alleged that she was entitled to grandparent

visitation pursuant to Section 452.402.1(3), because the child had resided in her home for at least

six months within the prior twenty-four-month period immediately preceding the modification

action, and Paternal Grandmother had unreasonably been denied visitation for a period exceeding

ninety days. Paternal Grandmother alleged that her intervention was necessary to protect her

claims and ensure judicial economy.

 The court’s order granting Paternal Grandmother intervention states that, “after review of

the file, said Motion is sustained.” The court’s file at that time showed that the court entered an

order of dissolution December 5, 2018, therein concluding that Mother had regularly denied Father

access to the minor child since the date the parties separated. Further, that it was in the child’s best

interests that Father be granted sole legal and sole physical custody of the child, and that

unsupervised contact with Mother would pose a serious risk of harm to the physical health and

emotional well-being of the minor child due to Mother’s illegal drug use and criminal behavior.

 27
 When Mother moved to modify the dissolution judgment, she admitted that she was

violating the dissolution judgment by having unsupervised parenting time with the child. She did

not allege that any of her own personal circumstances had changed to make her fit to assume

custody. She alleged that Father’s circumstances had changed, however, making modification of

the judgment necessary because, among other things, Father assaulted Mother in front of the child,

Father used controlled substances while caring for the child, and Father abused the child. Mother

also alleged that Father had left S.M. with Paternal Grandmother and “had executed to her favor a

Power of Attorney permitting her to maintain a supervisory role in their son’s life,” but that Father

had also told her that Paternal Grandmother abused the child. In spite of Mother’s allegations

against Father and lack of averments indicating her own circumstances had changed, Mother

requested that she and Father be given joint custody of the child.

 Moreover, at the time Paternal Grandmother requested intervention, the court’s file

suggested that neither parent was fit to have custody of S.M.19 Further, that even if Mother’s

modification request was granted, Paternal Grandmother would play a significant role in S.M.’s

life because Mother requested that the court grant Father joint legal and joint physical custody of

S.M., knowing that Father on his own behalf had executed a Power of Attorney to Paternal

Grandmother.

 Under Section 452.375.5(5)(a), when the court finds each parent unfit, unsuitable, or

unable to be a custodian, or the welfare of the child requires, and it is in the best interests of the

child, then custody, temporary custody, or visitation may be awarded to a person related by

 19
 One day prior to trial and well after Paternal Grandmother had been allowed to intervene, Mother filed a
Proposed Parenting Plan wherein she requested sole legal and sole physical custody of S.M. Mother’s “Motion to Set
Aside Default Judgment or Alternatively, Motion to Modify” was never amended to allege that her own circumstances
had changed and that she no longer engaged in drug use or criminal conduct.

 28
consanguinity or affinity to the child. “Before the court awards custody, temporary custody or

visitation to a third person under this subdivision, the court shall make that person a party to the

action[.]” Id. (Emphasis added). Under this provision of the statute, “any person may petition the

court to intervene as a party in interest at any time as provided by supreme court rule.” §

452.375(5)(b). With regard to grandparent visitation, under Section 452.402, “[a] grandparent

shall have the right to intervene in any dissolution action solely on the issue of visitation rights”

and “shall also have the right to file a motion to modify the original decree of dissolution to seek

visitation rights when visitation has been denied to them[.]”

 We find that Mother’s own pleadings supported that third-party placement of the child

might ultimately be necessary when the court ruled on Mother’s motion to modify. Further,

Mother’s pleadings confirmed Paternal Grandmother’s significant role in the child’s life when she

alleged that Father had given Paternal Grandmother Power of Attorney and that Paternal

Grandmother exercised a supervisory role in the child’s life. Under Section 452.375.5(5) and

Section 452.402.1(3), the circuit court clearly had grounds to allow Paternal Grandmother to

intervene, as the record established that Paternal Grandmother’s claim for third-party

custody/visitation and Mother’s modification action had questions of law and fact in common.

Because Paternal Grandmother had a right, at the very least, to permissive intervention, Paternal

Grandmother had standing to bring her claims within Mother’s modification action.

 Mother’s fourth point on appeal is denied.

 Point V and VI – Temporary Restraining Order and Preliminary Injunction

 In her fifth point on appeal, Mother contends that the court erred in entering its Temporary

Restraining Order without providing notice to Mother, arguing that the order was entered in

violation of Rule 92.02. In her sixth point on appeal, Mother contends that the circuit court erred

 29
in entering its Preliminary Injunction, arguing that the order was entered without a hearing and

without giving Mother sufficient time to respond.

 “In any appellate review of a controversy, a threshold question is the mootness of the

controversy.” Grzybinski v. Dir. of Revenue, 479 S.W.3d 742, 745 (Mo. App. 2016). When the

question presented seeks a judgment that would have no practical effect on an existing controversy,

the matter is moot. State ex rel. Chastain v. City of Kansas City, 968 S.W.2d 232, 237 (Mo. App.

1998). In determining mootness, the appellate court may consider facts outside the record. State

ex rel. Monsanto Co. v. Pub. Serv. Comm'n of Missouri, 716 S.W.2d 791, 793 (Mo. banc 1986).

“When an event occurs that makes a court’s decision unnecessary or makes it impossible for the

court to grant effectual relief, the case is moot and generally should be dismissed.” In re Sw. Bell

Tel. Co.’s Proposed Revision to Gen. Exch. Tariff, P.S.C. Mo--No. 35, 18 S.W.3d 575, 577 (Mo.

App. 2000) (internal quotation marks and citations omitted). An actual controversy susceptible of

some relief must exist in order for this court to have jurisdiction. State ex rel. Mo. Cable Television

Ass’n v. Pub. Serv. Comm’n, 917 S.W.2d 650, 652 (Mo. App. 1996). “[A]n appeal will not lie from

an order granting, denying, or dissolving a preliminary injunction or from any other merely

interlocutory order or decree.” Furniture Mfg. Corp. v. Joseph, 900 S.W.2d 642, 646 (Mo. App.

1995).

 We find that, while there may be exceptions to the rule that an appeal will not lie from an

order dissolving a preliminary injunction, as well as exceptions to the rule of mootness, the

exceptions are inapplicable here.20 The Temporary Restraining Order was entered ex parte on

 20
 We note that Mother filed no reply brief contesting Paternal Grandmother’s claim that these issues are
moot.

 30
March 23, 2020, with an expiration date articulated in the Order as April 2, 2020. On April 1,

2020, the circuit court held a hearing and thereafter entered the Preliminary Injunction, which

granted Paternal Grandmother custody of the minor child and defined Mother’s and Father’s

visitation rights. The Preliminary Injunction was, however, superseded by the court’s Judgment

of Modification which granted sole legal and sole physical custody to Paternal Grandmother, and

found the Parenting Plan established therein to be in the best interest of the child.

 Because we are affirming the circuit court’s Judgment of Modification which superseded

the Preliminary Injunction, and the temporary restraining order has long expired, no effectual relief

would or could be granted if we were to address Mother’s claims as to the validity of the Temporary

Restraining Order or Preliminary Injunction. These claims are, therefore, moot.21

 Mother’s fifth and sixth points on appeal are denied.

 Conclusion

 We conclude that, 1) the Judgment of Dissolution of Marriage entered December 5, 2018,

is not void with regard to all orders related to custody, visitation, or support of the minor child, as

the circuit court had subject matter jurisdiction to entertain those issues, 2) the transcript of the

circuit court proceeding does not deprive this court of sufficient information to make appellate

review possible, 3) Mother waived her claim that the circuit court denied Mother due process and

thereby erred in granting Paternal Grandmother’s Motion to Intervene by, pursuant to Rule 55.27,

not raising her claim of insufficiency of notice at the earliest opportunity, 4) the circuit court did

not err in allowing Paternal Grandmother to intervene, 5) Mother’s claim that the circuit court

 21
 The record reflects that Mother never complied with the Temporary Restraining Order or Preliminary
Injunction, and at the time of trial had not returned the child to the State of Missouri or to Paternal Grandmother’s
care and custody as required by the court in those orders.

 31
erred in entering its Temporary Restraining Order without notice in violation of Rule 92.02(b)(3)

is moot, and 6) Mother’s claim that the circuit court erred in entering its Preliminary Injunction is

also moot.

 We affirm the circuit court’s Judgment.

 Anthony Rex Gabbert, Judge

All concur.

 32